Commonwealth *v.* Perry.

COMMONWEALTH *vs.* FREDERICK H. PERRY. °

Franklin. May 5, 2000. - August 2, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, SPINA, & COWIN, JJ.

*Homicide. Malice. Joint Enterprise. Evidence,* Hearsay, Statement of
codefendant, Expert opinion. *Kidnapping. Practice, Criminal,* Assistance
of counsel, Admissions and confessions, Waiver, Presence of defendant,
Capital case. *Constitutional Law,* Admissions and confessions, Waiver of
constitutional rights, Assistance of counsel. *Waiver.*

At the trial of an indictment for murder in the first degree, the Com-
monwealth's evidence was sufficient to prove beyond a reasonable doubt
that the defendant acted with malice aforethought. [221-223]
At the trial of an indictment for murder in the first degree, the Com-
monwealth's evidence was sufficient to prove beyond a reasonable doubt
that the defendant acted as a joint venturer [223-224], and that the acts of
the joint venturers were the proximate cause of the victim's death
[224-225].
At the trial of an indictment for murder in the first degree, the Com-
monwealth's evidence was sufficient to prove beyond a reasonable doubt
that the defendant, acting individually, caused the death of the victim, and
that any assault and battery on the victim by others was not, in the
circumstances, an unforeseeable, independent, intervening cause that would
relieve the defendant of liability. [225-230]
Evidence at the trial of an indictment for kidnapping was sufficient to prove
beyond a reasonable doubt that the defendant was guilty on a theory either
of joint liability or of individual liability. [230-231]
There was no merit to a defendant's claim that his conviction of kidnapping
was duplicative of his conviction of murder. [231-232]
There was no error in the admission in evidence of a criminal defendant's
statement to police, where the judge found on the basis of the evidence
before him that the defendant had not requested an attorney be present dur-
ing questioning [232-233], and that the defendant's waiver of his Miranda
rights was knowing, intelligent, and voluntary [233-234].
At a murder trial the extrajudicial statement of a coventurer, made during the
pendency of the joint venture and in furtherance of its goal, was properly
admitted in evidence, and the evidence at trial was sufficient to prove that
the speaker was a coventurer. [234-236]
At a murder trial, the judge properly excluded from evidence proffered
testimony of an expert medical witness that would have been an improper
expert commentary on another witness's credibility. [236-237]
An issue regarding a criminal defendant's right to be present at sidebar during
juror voir dire was waived where the defendant made no request to be

present at sidebar, the judge did not exclude him, and defense counsel did not object to the defendant remaining seated. [237-238]

No substantial likelihood of a miscarriage of justice arose from police officers' asserted denial of the defendant's right to use a telephone when they questioned him at a house of correction wherein he was incarcerated on another charge. [238]

INDICTMENT found and returned in the Superior Court Department on June 16, 1995.

A pretrial motion to suppress evidence was heard by *William H. Welch,* J., and the case was tried before him.

*James L. Sultan* (*Catherine J. Hinton* with him) for the defendant.

*Judith Ellen Pietras,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of kidnapping and of murder in the first degree based on a theory of extreme atrocity or cruelty, Frederick H. Perry appeals. On appeal, the defendant claims that his motion for required findings of not guilty should have been allowed on both indictments. He also alleges error in the (1) admission of his statements to the police, (2) admission of hearsay evidence, (3) exclusion of expert testimony, (4) denial of his right to be present at a "critical stage[] of the proceeding[]," and (5) admission of his statements to the police despite an alleged violation of his right to make a telephone call pursuant to G. L. c. 276, § 33A. We conclude that the defendant's convictions should be affirmed. We have reviewed the record pursuant to G. L. c. 278, § 33E, and conclude that the interests of justice do not require the entry of a verdict of a lesser degree of guilt on the murder conviction or a new trial.

1. *Facts.* "We summarize the facts as the jury could have found them in the light most favorable to the Commonwealth, reserving certain facts for discussion in conjunction with other issues." *Commonwealth* v. *Federici,* 427 Mass. 740, 741 (1998), citing *Commonwealth* v. *Sarourt Nom,* 426 Mass. 152, 153 (1997). See *Commonwealth* v. *Salemme,* 395 Mass. 594, 595 (1985). Because the defendant argues that his motion for a required finding at the close of the Commonwealth's evidence should have been allowed, we summarize the evidence presented in the Commonwealth's case-in-chief. See *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979).

A. *The defendant's acts.* In the autumn of 1994, the victim and the defendant traveled from Massachusetts to Arizona. The victim had attended special education classes and had participated in the Special Olympics. He was a talented cartoonist and the two men hoped to start a tattooing business. This enterprise never materialized, and, by December, the two returned to Massachusetts looking for a place to live.

The defendant and the victim spent approximately ten days with a friend, Wendy Poirier, and her fiancé, Danny Nauman. At that time, the victim weighed approximately 230 pounds. Although the defendant and the victim were friendly before the trip to Arizona, Poirier said that, by the time they moved in with Poirier, the defendant "had become [verbally] abusive to [the victim], making very rude comments to him [and] calling him names." Poirier observed the defendant punch and push the victim several times. According to Poirier, the victim "cower[ed] in the corner" in response to these beatings. One day, Poirier observed the defendant burn a cigar into the victim's forehead.[1] Poirier then told the defendant and the victim that both of them would have to leave.

The defendant and the victim went to stay at the defendant's mother's two-story family home. Also residing at the home were the defendant's three brothers, Leon, Richard, and Roger Perry. The defendant's mother and brothers were the lessees of the home. The defendant was not a signatory on the lease.

During the second week of December, Frank Parker, who did not know the Perrys, was with friends of the Perry family. The group stopped at the defendant's mother's home. The defendant, the defendant's mother, Richard, and Roger were present. The defendant called the victim, who was on the second floor, to come downstairs. The defendant asked the group whether they wanted to "see something funny." According to Parker, the victim "looked like he had been beaten before." Parker said that the defendant delivered several "[c]losed fisted punch[es] to the [victim's] temple." The victim begged the defendant to stop the beating. After several punches, the defendant told the victim to go upstairs, which the victim did.

Throughout December, 1994, a number of individuals witnessed other incidents at the defendant's mother's house. A

---

[1]Poirier's testimony was admitted for the limited purpose of showing the nature of the relationship and any pattern of behavior between the defendant and the victim.

friend of the defendant, Michelle King, saw the defendant and Nauman roughhousing with the victim. King said that this behavior escalated until the defendant was "punching at [the victim] and . . . shaking him around."

On another occasion in December, 1994, King, Poirier, Nauman, and the defendant were talking. Poirier and Nauman hinted to the defendant that the victim had betrayed some confidence of the defendant. Both the defendant and the victim were wanted by the police on outstanding warrants, and the defendant was concerned that the victim might betray him. The next day, King observed that the victim's "face was bruised" and "swelled out, [and] all sorts of different colors."

By Christmas, the victim, who, according to Poirier, had been "a very outgoing person," had become "very quiet and withdrawn." Around Christmas time, Laura White, another acquaintance of the Perry family, noticed that the victim's tongue was burned. The defendant told her that "they held [the victim] down on the kitchen floor and put a butter knife in the flames of the gas fire, and burnt [the victim] with it."

By the end of December, White, who had taken courses with a view toward becoming a licensed practical nurse, noticed that the victim had "several burns on his arms" and that "he had been beaten. . . . [H]e had a black eye and his face was a little swollen." She treated the victim's burns with salve. The defendant told White that the victim also had a burn on his penis. Poirier, who saw the victim at the end of December, noticed through the victim's shirt that the victim also had a large burn on his shoulder.

During the second week of January, 1995, Frank Parker once again accompanied friends who stopped by the defendant's mother's home. The defendant's brothers, his mother, and his cousin, Clinton Maynard, all were present. Maynard was beating the victim by "slamm[ing]" the victim neck first onto the floor. The defendant joined Maynard and each of them took turns beating the victim. One of the two men held the victim so as to keep his neck exposed, and the other man used his outstretched arm to hit the victim across the neck. The defendant used his arm, which was in a brace, to beat the victim across the neck. The victim begged the two men to stop. According to Parker, the beating continued for "a good half hour to [forty-five] minutes."

Parker also said that, on this occasion, the defendant and

Maynard placed keys between their fingers and raked the keys across the victim's head so as "to draw blood and rip his scalp open." In addition, the defendant used a bicycle chain wrapped in tape as "brass knuckles," punching the victim above the left eye and opening a wound approximately one inch around.

That evening, Parker also saw the defendant and Maynard take the victim into the bathroom, where they scrubbed him with household cleaners. The victim was screaming, while the defendant and Maynard laughed. When the victim came out of the bathroom, he had cuts and bruises all over his face. During one of Parker's two visits to the defendant's mother's home, the defendant told Parker that, if Parker went to the police, he (Parker) would "end up floating in the river and nobody would be able to do anything about it."

On February 14, 1995, White, who had treated the victim's burns in December, again visited the defendant's mother's home and asked to see the victim. The defendant went upstairs and returned with the victim. White observed that the victim "had been beaten severely." According to White, "[h]is face was swollen almost to a pumpkin size. It was purple. His . . . left eye was almost completely swollen shut. . . . His jaw looked . . . [n]ot centered on his face." The victim's arm appeared to be broken because it was "pulled in and kind of twisted down." There was blood coming from the victim's ears, nose, and the side of his mouth. His hands were tied, and he smelled as if he had not showered for some time. White also noted that the victim appeared to have lost a significant amount of weight. White asked the defendant if she could look at the victim's arm. The defendant said, "No."

In February or March of 1995, Melissa Terry, another acquaintance of the Perry family, visited the defendant's mother's home. The victim, who typically was upstairs during Terry's visits, called downstairs, saying that he was naked and had to go to the bathroom. Terry testified that the defendant's mother shouted back, "I'm not in charge of you" and that "Freddy [the defendant] was."[2] The victim attempted to come down the stairs. The defendant, Roger, and Maynard chased the victim back up the stairs. Terry heard a "bunch of noise" and then heard the victim crying and saying that he was bleeding. This went on for ten to fifteen minutes, during which time Terry

---

[2] We address the admissibility of this evidence, *infra* at 234-236.

heard the men "laughing, like it was real funny to them." That night, the police came to the defendant's mother's home looking for the defendant and the victim. According to Terry, the defendant's mother told the police that the two men were still in Arizona.

White also testified that, on one of her visits to the defendant's mother's household, the victim "was beaten" and his wrists were tied up so as to force him to hold a coffee can in his hands. The defendant used the coffee can as a tobacco spittoon, occasionally missing the can and spitting on the victim. When some amount of liquid had accumulated in the can, the defendant forced the victim to drink it, which caused the victim to vomit. The defendant repeated this process several times while White was present. The victim asked to call his mother, but the defendant told him, "No." On one of her visits to the Perry household, White told the defendant that "if he kept beating [the victim] like that, that [the victim] was going to die."

B. *The defendant's confession.*[3] During the Commonwealth's presentation of evidence, State police Troopers Francis Hart and Thomas Nartowicz testified to the contents of the defendant's oral and written confessions. Although the defendant attempted to place the primary culpability on Maynard and Nauman, the defendant described beating the victim and noted that, at one point, the victim's "face was all busted up and he couldn't eat." The defendant admitted that he "beat [the victim] pretty good a few times" and "kicked him with [his] work boots probably more than [he] should have." The defendant also admitted to hitting the victim with a "club of wood" and with "dumbbell bars." When the troopers asked the defendant about his and Maynard's reactions to the beatings, the defendant responded that "they laughed a few times."

The defendant told the police that Maynard "tied and gagged [the victim] to the weight bench, and that [the victim] was gagged several times." The defendant also admitted that he administered electric shocks to the victim using a frayed electrical cord.[4] The defendant claimed that, although Maynard initiated this incident, they "all had to try that, because [Maynard] said it was fun."

---

[3]The defendant's motion to suppress his statements was denied. This issue is discussed *infra* at 232-234.

[4]The Commonwealth presented the testimony of an electrician who stated that such electric shocks are "extremely painful."

The defendant told the troopers that he had been aware that the victim was losing weight. According to the defendant, the victim died toward the end of March or beginning of April, 1995. Before the victim died, the defendant also noticed that the victim "was pretty weak." The defendant admitted to the police that he "slapped" the victim on the evening on which, according to the defendant, the victim died. The defendant claimed that he also heard Maynard "slap" the victim later that evening.

When the defendant discovered the victim had died, he, his brothers Richard and Roger, and Maynard took the body, wrapped it in a blanket, and secured it with coat hangers. They put the body in the back of a van, along with weights, a cement block, and an old vise, to weight the body down. They then drove the body to a quarry in New Hampshire which appeared "pretty deep" and left the body there.

C. *Physical evidence.* The body was discovered in a shallow pool in a New Hampshire quarry on May 23, 1995. The body was wrapped in blankets, with weights and other heavy objects attached, as the defendant described in his confession. The body had deteriorated significantly because of the damp conditions, but the medical examiner was able to determine that the victim suffered the following injuries while still alive: a fractured jaw resulting from a "very, very powerful blow to the face"; a bruise with a laceration around the mouth; a bruise on the cheek; two black eyes; considerable bruising of the lower extremities; blunt force trauma to the knees; bruising from blunt force injury to the buttocks; considerable bruising on the arms suggesting that the victim "was trying to fend off blows"; fractured bones in the left hand, resulting from "crushing blunt force"; and a portion of skin removed from part of his back. The medical examiner could not ascertain whether a number of additional injuries had been inflicted antemortem or post mortem, including two scalp irregularities, one of which was consistent with being scraped with a key; a "flaying wound" or, in popular parlance, a partial "scalping"; blunt force trauma to one foot; and the partial amputation of at least one finger.

The medical examiner noted that the victim would have had difficulty chewing food with the jaw injury. Based on the medical examiner's estimation of the victim's weight at the time of death, the victim had lost approximately one hundred pounds between December, 1994, when the beatings began, and his death. The medical examiner could not determine with certainty

the final act that caused the victim's death, but his testimony was that the cumulative effect of the beatings and starvation led to the victim's death.

In addition to medical testimony, the jurors heard the testimony of police officers who searched the house at which the beatings of the victim took place, as well as the house to which the Perrys moved shortly thereafter. The police found bloodstains on the wallpaper and floor of an upstairs bedroom, bloodstained scissors, weights, and an electrical cord with severed ends.

2. *Sufficiency of evidence on murder charge.* The Commonwealth requested that the charge of murder in the first degree be submitted to the jury on theories of individual and joint liability. Because the jurors returned a general verdict of guilt on the conviction of murder in the first degree, we review the sufficiency of the evidence under both theories.[5] See *Commonwealth* v. *Flynn*, 420 Mass. 810, 811 (1995). We reject the defendant's claim that the Commonwealth's evidence on the conviction of murder in the first degree was insufficient both under theories of joint and individual liability.

" '[T]he question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' [emphasis in original omitted]. *Commonwealth* v. *Latimore*, [378 Mass. 671, 677 (1979)], quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). See Mass. R. Crim. P. 25 (a), 378 Mass. 896 (1979). . . . '[I]t is not necessary to prove that no one other than the accused could have performed the act.' *Commonwealth* v. *Casale*, 381 Mass. 167, 175 (1980). However, '[t]he question of guilt must not be left to conjecture or surmise.' *Commonwealth* v. *Anderson*, 396 Mass. 306, 312 (1985)." *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989).

A. *Malice aforethought.* Under both joint and individual liability theories of murder in the first degree with extreme atrocity or cruelty, the Commonwealth was required to prove that the defendant acted with malice aforethought. See *Commonwealth* v. *Semedo*, 422 Mass. 716, 719-720 (1996) (under joint venture theory, "the Commonwealth must show that the

---

[5]The better practice in these circumstances would be to provide a verdict slip requiring the jurors to specify on which theory (or theories) they convict a defendant.

defendant shared with the principal the mental state required for the crime of murder. . . . The mental state required for murder is malice aforethought"). The defendant claims that the Commonwealth's evidence was insufficient to prove beyond a reasonable doubt that the defendant acted with the requisite mens rea. We disagree.

"Malice aforethought may be shown by proof that the defendant, without justification or excuse, intended to kill the victim. Malice aforethought may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." *Commonwealth* v. *Semedo, supra* at 720. The defendant's use of deadly weapons in beating and electrocuting the victim supports the reasonable inference that the defendant intended to cause death. See *Commonwealth* v. *Williams*, 428 Mass. 383, 388 (1998); *Commonwealth* v. *Williams*, 422 Mass. 111, 121 (1996); *Commonwealth* v. *Semedo, supra*. Common sense dictates these acts created a plain and strong likelihood of death. See *id.* at 720, citing *Commonwealth* v. *Mahoney*, 406 Mass. 843, 848 (1990) (for proposition that "defendants should have known as vicious beating progressed that victim could suffer death").

In addition, the defendant was told by Laura White that, "if he kept beating [the victim] like that, that [the victim] was going to die."[6] "The jury could reasonably have concluded that [the defendant's] intention was to inflict injury and that this intention was coupled with an awareness that [there was a plain and strong likelihood that] death might result from the injuries he participated in inflicting. Under the third prong of malice, the jury could infer that 'in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow [from his] act.' " *Commonwealth* v. *Semedo, supra* at 720, quoting *Commonwealth* v. *Judge*, 420 Mass. 433, 437-438 & n.3 (1995). See *Commonwealth* v. *Vazquez*, 419 Mass. 350, 353 (1995) ("Specific

---

[6]The defendant also demonstrated his knowledge that his acts were criminal by telling Parker that, if he (Parker) went to the police, he (Parker) would "end up floating in the river and nobody would be able to do anything about it."

intent, therefore, could have been established by the defendant's repeated infliction of serious physical injuries").[7]

B. *Proximate cause.* (1) *Joint venturer liability.* The defendant claims that the Commonwealth's evidence was insufficient to show that (1) he acted as a joint venturer and (2) the acts of the joint venturers were the proximate cause of the victim's death. We disagree.

Where multiple assailants participate in a joint venture to commit murder, "[t]he Commonwealth [is] not required to prove the precise conduct of each [individual] if there [is] evidence that a [homicide] took place." *Commonwealth* v. *Bianco*, 388 Mass. 358, 367, *S.C.*, 390 Mass. 254 (1983). See *Commonwealth* v. *Williams*, 422 Mass. 111, 121 (1996), quoting *Commonwealth* v. *Chipman*, 418 Mass. 262, 268 (1994) ("Direct evidence of who shot the victim[] 'is not required where, as here, there is strong circumstantial evidence that one of the [assailants] shot' the victim[]"). Rather, the Commonwealth's burden is to "prove beyond a reasonable doubt that the defendant [1] was present at the scene of the crime, [2] with knowledge that another intended to commit a crime, and [3] by agreement was willing and available to help the other if necessary." *Commonwealth* v. *Semedo*, *supra* at 719. "[M]ere presence at the commission of the wrongful act and even failure to take affirmative steps to prevent it do not render a person liable as a participant." *Commonwealth* v. *Benders*, 361 Mass. 704, 708 (1972).

The Commonwealth's evidence was sufficient to show that the defendant was present, knew about, participated in, and rendered aid to the joint venture. See *Commonwealth* v. *Semedo*, *supra.* Witnesses saw the defendant act in concert with Maynard and others — taking turns holding and beating the victim. The defendant participated with Maynard in electrocuting the victim. The evidence also showed that, when outsiders came into the defendant's mother's house, various members of the family would block the opening to the area of the house where the victim was kept. The defendant assisted his brothers and

---

[7]The defendant also argues that he acted out of fear of Clinton Maynard and that, therefore, he could not have acted with malice aforethought. This argument lacks merit. The jurors need not have credited the portion of the defendant's statement to the police that indicated that he acted out of fear. See *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985) (in reviewing denial of motion for required finding, we consider evidence in light most favorable to Commonwealth).

Maynard in disposing of the body. Evidence that the defendant assisted in "avoid[ing] detection and detention" and "attempt[ed] actively to conceal evidence" warrants the inference that he continued to be involved in the joint venture. *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 863 (2000). These facts support submission of the case to the jurors on the theory that the defendant was engaged in an ongoing joint venture with others to inflict brutal and potentially fatal injuries on the victim over an extended period of time.

The Commonwealth's evidence also sufficed to show that the acts of the joint venturers were the proximate cause of the victim's death. To be sufficient on the issue of proximate cause, the evidence must warrant the inference that these acts were such that they, "in the natural and continuous sequence, produce[d] the death, and without which the death would not have occurred." *Commonwealth* v. *Rhoades*, 379 Mass. 810, 825 (1980), quoting California Jury Instructions, Criminal § 8.55 (4th rev. ed. 1979) (defining proximate cause).

The evidence suggested several possible causes of death. The cause of death was listed on the death certificate as multiple blunt and sharp force injuries applied over time, to the head, torso, and extremities. The medical examiner said that, after completing his inquiry into the cause of death, his "supposition" was that the victim "died of lung infection [which was] a direct consequence of the stress, pain, inability to eat and other factors, including hemorrhage, as a final, overall effect of all of those injuries." The medical examiner also said that some of the wounds, if left untreated, could have caused the victim's death.

The evidence showed that the defendant and his coventurers participated in repeated and severe beatings of the victim, often applying potentially deadly force; that the defendant participated in the incident during which the victim's tongue was burned with a butter knife; and that the defendant and Maynard repeatedly hit the victim across the neck. These facts warrant the inference that the defendant and his coventurers caused blunt force trauma to the victim, caused the victim's inability to eat, and caused the victim to experience "stress" and "pain." Because the foregoing were cited by the medical examiner as causes of the victim's death, the evidence sufficed to permit the jurors to determine whether the defendant, as a participant in a joint venture, caused the victim's death.

The defendant notes that the medical examiner's testimony indicated that the victim may have died of pneumonia. According to the defendant, the Commonwealth's proof on the proximate cause issue fails because of this intervening cause. We do not agree. "The defendant's acts need not be the sole or exclusive cause of death." *Comonwealth* v. *Santiago*, 425 Mass. 491, 503-504 (1997), *S.C.*, 427 Mass. 298, and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998). Where a defendant causes an injury which, along with other contributing factors or medical sequella of the injury, leads to death, jurors may determine that the defendant's acts were the proximate cause of the injury. See *Commonwealth* v. *Davis*, 403 Mass. 575, 582 (1988) (that extreme cold also contributed to death does not relieve defendant of responsibility); *Commonwealth* v. *Vanetzian*, 350 Mass. 491, 492-495 (1966) (defendant's conviction affirmed where operation on gunshot wound caused by defendant led to peritonitis and three additional operations; where cause of death was determined to be "intra-abdominal abscesses, bronchopneumonia, and left empyema due to gunshot wound"; and, where autopsy could not "positively exclude" chronic bronchitis as cause). Here, the medical examiner's testimony that any pneumonia would have been caused directly by the beatings and abuses sufficed to show that the acts of the defendant and his coventurers were the proximate cause of the victim's death.

We also reject the defendant's assertion that the Commonwealth was required to prove that a particular beating or beatings caused the victim's death and that the defendant was present at such beatings. The flaw in the defendant's argument is his assumption that each violent incident was an independent joint venture. The various beatings and abuses inflicted on the victim were not independent crimes or ventures producing independent effects: the acts constituting the crime were the multiple abuses and beatings which had the cumulative effect of causing the victim's death.[8]

(2) *Individual liability.* The defendant claims that the Com-

---

[8]Cf. *Commonwealth* v. *Lynch*, 428 Mass. 617, 622 (1999) ("The defendant argues that the rape and murder were two separate and unrelated criminal acts, and that his participation was limited to the rape. While the defendant offers one possible interpretation of the evidence, it is not the only reasonable one. '[T]o the extent that conflicting inferences are possible from the evidence, it is for the jury to determine where the truth lies.' *Commonwealth* v. *Bennett*, 424 Mass. 64, 68 [1997], quoting *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 [1981]"); *People* v. *Talamantez*, 169 Cal. App. 3d 443, 455 (1985) (under

monwealth's evidence was insufficient to show that, on a theory of individual liability, he caused the victim's death. In support of this claim, the defendant asserts that the Commonwealth failed to show that a specific act of his caused the victim's death. Along these same lines, the defendant asserts that the Commonwealth's evidence was insufficient to show that the victim's death was not caused by the intervening act of a third party, such as Maynard or one of the defendant's brothers. The defendant also argues that the Commonwealth did not produce evidence sufficient to show that the defendant harmed the victim between February and the time of the victim's death at the end of March or beginning of April. Each of these arguments fails.

The Commonwealth produced sufficient evidence to show that the defendant, acting individually, caused the victim's death. "The fact that the cause of death was not ascertainable from the body does not of itself preclude the Commonwealth from proving that the victim's death was by violence and the criminal agency of the defendant beyond a reasonable doubt." *Commonwealth* v. *Lawrence*, 404 Mass. 378, 390 (1989), quoting *Commonwealth* v. *Nadworny*, 396 Mass. 342, 354 (1985), cert. denied, 477 U.S. 904 (1986). When an autopsy does not provide enough information to determine with certainty the cause of death, other evidence at trial may nevertheless support the inference that the defendant's act was the proximate cause of the death of the victim. See *Commonwealth* v. *Nadworny, supra* at 358-359, and cases cited.[9]

The defendant's use of deadly weapons in beating and electrocuting the victim, along with the medical examiner's testimony as to the cause of death, suffice for the jurors to

---

murder by torture statute, "murder by torture finding encompasses the totality of brutal acts and circumstances that led to [the victim's] death. [The] suggestion to break the torture into various constituent — blows, abuses, strangulations — elements would result in the conclusion that none, taken by themselves, resulted in the death. It was the whole series of brutal and cruel acts, the continuum of sadistic violence directed against [the victim] which constituted the torture").

[9]The defendant points out that the autopsy did not produce evidence of many of the injuries that witnesses saw the defendant inflict. This does not render the Commonwealth's evidence insufficient. The medical examiner testified that certain of his findings were inconclusive because of the state of the body and the wet environment in which the body was left. In these circumstances, the jurors were entitled to credit the testimony of individuals who witnessed the defendant injuring the victim. See *Commonwealth* v. *Lawrence*, 404 Mass. 378, 390 (1989).

conclude that the defendant's acts caused the death of the victim. The defendant told police that he kicked the victim with his work boots "more than [he] should have." The defendant beat the victim with a "club of wood" and with "dumbbell bars," applied electric shocks to the victim, used his arm, which was in a brace, to hit the victim full across the neck, and hit the victim in the head with a bicycle chain wrapped in tape. The defendant slapped the weakened victim on the night he died. These acts also support the conclusion that the defendant's acts caused the victim's death. This evidence was sufficient to permit the jurors to draw the inference that the defendant's acts caused the victim's death. See *Commonwealth* v. *McLeod*, 394 Mass. 727, 745, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985) (where multiple assailants beat victim to death and evidence showed that defendant assaulted victim with deadly weapon so as to put victim's life in jeopardy, defendant's "liability as a contributing cause of [the victim's] death need not be related to any theory of joint liability, nor need [the defendant's] acts have been the sole cause of death").

The defendant, however, also asserts that the evidence failed to show that the defendant's acts, and not the intervening acts of third parties (namely, Maynard and the defendant's brothers), caused the victim's death. We reject the defendant's assertion that the beatings by other individuals constituted an independent, intervening cause of the sort that would relieve the defendant of culpability. Maynard, the defendant, and other individuals as joint venturers and as individuals beat and abused the victim on consecutive occasions. The defendant was well aware of what was happening and participated in most of the beatings described by witnesses. "Intervening conduct that is reasonably foreseeable will not relieve the defendant of criminal responsibility." *Commonwealth* v. *Catalina*, 407 Mass. 779, 791 (1990), citing *Commonwealth* v. *Askew*, 404 Mass. 532, 534 (1989). See *Commonwealth* v. *McLeod, supra* at 745, citing *Commonwealth* v. *Golston*, 373 Mass. 249, 256 (1977), cert. denied, 434 U.S. 1039 (1978) ("to supersede defendant's liability, intervening cause must be the sole cause, not merely a contributing cause"). The alleged intervening conduct — i.e., the continuing abuses by Maynard and the Perrys — was reasonably foreseeable because the defendant knew that Maynard had said that electrocuting the victim "was fun," that they all had laughed while beating and abusing the victim. The defendant

was present during most of the time that the abuse continued. Given the defendant's knowledge of and participation in many assaults against the victim, as well his knowledge of others beating and abusing the victim for a long period of time, it cannot be said that the assault and the abuse by the other participants whom he saw abuse and beat the victim constitutes an unforeseeable, independent, intervening cause.

Further, the defendant's argument misreads our law as to intervening acts and individual liability. "There may be more than one proximate cause of death. When the conduct of two or more persons contributes concurrently as proximate causes of a death, the conduct of each is a proximate cause of the death regardless of the extent to which each contributes to the death. A cause is concurrent if it was operative at the moment of death and acted with another cause to produce the death." *Commonwealth* v. *McLeod, supra* at 745 n.21, quoting California Jury Instructions, Criminal § 8.55 (4th rev. ed. 1979).[10] Here, the medical examiner testified that the beatings, inability to eat, stress, and pain caused the victim's death. The evidence warranted the inference that the defendant participated in the beatings and other abuses, and that the effects of these acts were operative at the time of death and caused the victim's death. Under *Commonwealth* v. *McLeod, supra,* "[w]hen the conduct of two or more persons contributes concurrently as proximate causes of a death, the conduct of each is a proximate cause of the death regardless of the extent to which each contributes to the death."

The defendant, however, points to our cases that state that, "[w]hen the evidence tends equally to sustain either of two *inconsistent* propositions, neither of them can be said to have been established by legitimate proof" (emphasis added). *Commonwealth* v. *Salemme,* 395 Mass. 594, 601 (1985), quoting *Commonwealth* v. *Fancy,* 349 Mass. 196, 200 (1965). We have applied this rule where multiple defendants play some role in

---

[10]See *Commonwealth* v. *McLeod,* 394 Mass. 727, 744-745, cert. denied sub nom. *Aiello* v. *Massachusetts,* 474 U.S. 919 (1985), quoting *Commonwealth* v. *Hackett,* 2 Allen 136, 142 (1861) (" 'If a person inflicts a wound with a deadly weapon in such manner as to put life in jeopardy, and death follows as a consequence of this felonious and wicked act, it does not alter its nature or diminish its criminality to prove that other causes cooperated in producing the fatal result.' . . . Thus, [the defendant's] liability as a contributing cause of [the victim's] death need not be related to any theory of joint liability[.] [N]or need [the defendant's] acts have been the sole cause of death").

the events leading to the victim's death, but where there is insufficient evidence as to whether any of the acts of the individual defendant before us contributed to the death. This was the case in *Commonwealth* v. *Flynn,* 420 Mass. 810 (1995), where the medical examiner testified that the cause of death was blunt force applied to the head and face. The only eyewitness to the beating of the victim by the defendant and another individual testified that the defendant never beat or kicked the victim above the chest. *Id.* at 812. One of three inconsistent statements given by the defendant indicated that the defendant did strike the victim in the face, but that statement also suggested that this occurred well before the blows that caused the victim's death. *Id.* at 814. We concluded that "[t]he evidence . . . left the defendant's guilt on an individual liability theory 'to conjecture or surmise and ha[d] no solid foundation in established facts.' " *Id.* at 818, quoting *Commonwealth* v. *O'Brien,* 305 Mass. 393, 401 (1940).

This case is distinguishable from *Commonwealth* v. *Flynn, supra.* Here the Commonwealth's evidence showed that the victim's death was caused by the cumulative effect of the multiple beatings, many of which the defendant perpetrated. The evidence linked the defendant's acts to the factors cited by the medical examiner as causing the victim's death. This evidence was sufficient for the jurors to conclude that the defendant's acts were the proximate cause of the victim's death.

We turn next to the defendant's argument that there was a gap of weeks or months in the Commonwealth's evidence pertaining to the defendant's actions against the victim. To make its case, the Commonwealth need not prove that the defendant continued to beat the victim between mid-February and the time of the victim's death at the end of March or beginning of April: the evidence supported the conclusion that the victim died because of the cumulative effect of being beaten for months.

Nevertheless, there was evidence warranting the inference that the defendant continued to abuse the victim through the time of the victim's death. The defendant's confession to the police describing his abuse of the victim did not indicate any change in his participation in the beatings in the weeks before the victim's death. In addition, the defendant continued to be involved in the crime through the time that he assisted in dispos-

ing of the body.[11] See *Commonwealth* v. *Nadworny*, 396 Mass. 342, 357 (1985), cert. denied, 477 U.S. 904 (1986) ("[t]he jury could have considered the great length of time and manner in which the body was secreted as indicative of the defendant's attempts to conceal evidence of his criminal act"). Thus, the jurors could infer that the defendant did not alter his behavior toward the victim in the weeks before the victim's death, particularly when the defendant admitted "slapping the victim the night the victim died." Also, evidence that the defendant assisted in "avoid[ing] detection and detention" and "attempt[ed] actively to conceal evidence" warrants the inference that he continued to be involved in the ongoing criminal venture as a joint venturer and individually. *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 863 (2000).

The evidence also showed that only two people saw the victim immediately before his death — the defendant and Clinton Maynard, both of whom "slapped" the victim. Although a "simple blow with the hand administered to a healthy adult" does not create a strong likelihood of death, *Commonwealth* v. *Mahnke*, 368 Mass. 662, 702 (1975), cert. denied, 425 U.S. 959 (1976), the victim's physical condition had deteriorated significantly, as the defendant was aware. Given the victim's weakened condition, the evidence supported the inference that either or both "slaps" contributed to the victim's death.[12] The Commonwealth's evidence on the issue of proximate cause was sufficient on joint and individual responsibility.

3. *Sufficiency of the evidence on the kidnapping charge.* The kidnapping charge was submitted to the jurors on theories of joint and individual liability. The defendant argues that the Commonwealth's evidence was insufficient to support a guilty verdict on either theory. Because the jurors returned a general

---

[11]This evidence of consciousness of guilt due to the victim's death, although insufficient by itself to establish guilt, may, along with the other evidence, warrant the inference that the defendant's participation continued through the time of the victim's death. See *Commonwealth* v. *Nadworny*, 396 Mass. 342, 357 (1985), cert. denied, 477 U.S. 904 (1986).

[12]Although we do not consider evidence introduced by the defendant in evaluating the claim that the defendant's motion for a required finding at the close of the Commonwealth's case-in-chief should have been granted, we note that the defendant's presentation of evidence strengthened the Commonwealth's case. The defendant testified that, on the night of the murder, he "slammed" the victim "upside of the head." Thus, the Commonwealth's case did not deteriorate after it rested its case in chief. See generally *Commonwealth* v. *Amazeen*, 375 Mass. 73, 79 n.5 (1978).

verdict, we must determine whether the evidence was sufficient on both theories. See *Commonwealth* v. *Flynn, supra* at 811. We conclude that it was.

A person is guilty of kidnapping if he or she "without lawful authority, forcibly or secretly confines or imprisons another person within this commonwealth." G. L. c. 265, § 26. The evidence showed that the defendant knew that Maynard tied and gagged the victim to a weight bench. When visitors came to the defendant's mother's house, the defendant or his brothers would stand blocking the entry to the stairs to the floor on which the victim was being held. One evening, when the defendant and his brothers were leaving the house for the evening, a witness heard either the defendant or his brother Roger say that "they" had the victim gagged and tied. The defendant told the victim that "he wasn't allowed to go near the windows or outside." The defendant would not allow the victim to come downstairs. During the incident with the tobacco juice, in which the defendant was the principal participant, the victim's hands and feet were bound. When the victim asked to be able to call his mother, the defendant said, "No."[13]

These facts are sufficient to show that, on a theory of joint liability, the defendant cooperated with others in the household to confine the victim by force and in secret. These facts also are sufficient to show that, on a theory of individual liability, the defendant bound the victim, prohibited him from communicating with his mother, and kept him upstairs. The evidence was sufficient to show that the defendant kidnapped the victim under both theories of liability.

The defendant also argues that the acts underlying the kidnapping conviction were merely incidental to the assaults and murder, and that, therefore, the convictions were duplicative. We continue to adhere to the approach announced in *Commonwealth* v. *Rivera*, 397 Mass. 244, 254 (1986), in which we stated that "we are unwilling to adopt a rule that requires the treatment of confinement or asportation used as a means to facilitate the commission of such crimes as merged in the substantive crime." There is no merit to the defendant's argument on this point. This case is also distinguishable from those in which the intent to commit the felony is used as the malice required to prove the murder. See *Commonwealth* v. *Prater*, 431

---

[13]The facts listed in note 16, *infra*, also support the inference that the defendant controlled the victim's movements.

Mass. 86, 95-97 (2000); *Commonwealth* v. *Christian*, 430 Mass. 552, 556-557 (2000).

4. *Evidentiary rulings*. A. *The defendant's statements to the police*. The defendant argues that his oral and written statements to the police should not have been admitted because (1) the police did not cease questioning when, according to the defendant, he requested the presence of an attorney; and (2) his statement was involuntary. There was no error.

The judge's findings and the record reveal the following facts. Troopers Hart and Nartowicz were ordered to question the defendant because information was received indicating that the defendant was involved in the murder of the victim. At that time, the defendant was in custody at a house of correction on an unrelated matter. The troopers arrived at the house of correction at approximately 3 A.M. and requested that the defendant be produced for questioning.[14] The defendant was brought to a room used by correction personnel as a lunch break room. The troopers read the defendant the Miranda warnings; the defendant read the warnings to himself; and the defendant signed a waiver indicating that he was willing to answer the troopers' questions. Over the course of three hours, the defendant was questioned orally and subsequently wrote out a statement. The defendant was seated at a table with the two troopers and was given cups of coffee. When the defendant needed to use the restroom, he was escorted to the appropriate facilities. The defendant was calm and cooperative, but showed little emotion through the course of the interview. When the defendant returned to his cell, the troopers requested that the correction officers prevent the defendant from using a telephone possibly to communicate with Maynard or other suspects.

(1) *Alleged violation of right to an attorney*. At the hearing on the motion to suppress, and at trial, Troopers Hart and Nartowicz testified that the defendant never requested that questioning cease and never asked that an attorney be present during questioning; the defendant, on the other hand, testified that he asked repeatedly to have an attorney present during questioning,

[14]The time of the interview does not appear to have been a calculated tactic on the part of the troopers. The troopers spent the evening and early morning hours questioning a number of individuals, including other members of the Perry family, who implicated the defendant in the death of the victim. After consulting with their commanding officer, the troopers were instructed to proceed to the house of correction to question the defendant.

but that the State troopers told him that no attorney was necessary. "It is well established that, if an individual in custody 'states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning.' *Miranda* v. *Arizona,* [384 U.S. 436, 474 (1966)]." *Commonwealth* v. *Judge,* 420 Mass. 433, 448 (1995).

The judge found "beyond a reasonable doubt . . . that [the defendant] never requested [an] attorney." The judge noted that his finding "is supported by the wholly credible testimony of Officers Hart and Nartowicz." The defendant's reliance on his testimony is misplaced because the judge did not credit it. We accept the judge's findings. The question of credibility is for the trial judge. See *Commonwealth* v. *Tavares,* 385 Mass. 140, 144-145, cert. denied, 457 U.S. 1137 (1982). Given these factual findings, there was no error in admitting the defendant's statements.

(2) *Voluntariness.* In support of his motion to suppress statements made at the interview with Troopers Hart and Nartowicz, the defendant offered the expert testimony of a psychiatrist who interviewed the defendant and administered a psychological test to the defendant. According to the psychiatrist, the defendant suffered from severe depression and paranoia and would not be able to sustain concentration throughout a three-hour police interview. Based on this testimony, the defendant alleges that his statement was made involuntarily, and, therefore, should not have been admitted. See *Commonwealth* v. *Hunter,* 416 Mass. 831, 834 (1994), *S.C.,* 427 Mass. 651 (1998). The judge, however, did not credit this testimony.

The Commonwealth offered the conflicting expert testimony of a psychologist. The psychologist disagreed with the psychiatrist's interpretation of the test results, particularly with respect to the defendant's ability to concentrate. In addition, according to the psychologist, the test administered to the defendant would not accurately reflect the defendant's mental state at the time the defendant spoke with the State troopers. The judge determined that the psychologist was credible.

" 'In reviewing a trial judge's determination that a voluntary waiver was made, the judge's subsidiary findings will not be disturbed, if they are warranted by the evidence, and his resolution of conflicting testimony will be accepted.' *Commonwealth*

v. *Santo*, 375 Mass. 299, 303 (1978). . . . Although the judge's ultimate findings are open for review, 'a finding of voluntary waiver is "entitled to substantial deference by this court." *Commonwealth* v. *White*, 374 Mass. 132, 138 (1977), aff'd, 439 U.S. 280 (1978).' *Commonwealth* v. *Tabor*, [376 Mass. 811, 822 (1978)]. However, '[o]ur appellate function requires that we make our own independent determination on the correctness of the judge's "application of constitutional principles to the facts as found . . . ." *Brewer* v. *Williams*, 430 U.S. 387, 403 (1977).' *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977)." *Commonwealth* v. *Tavares*, *supra* at 144-145.

The judge determined that the defendant was competent to waive his rights and to give both oral and written statements voluntarily to the police. In support of this determination, the judge found that the defendant's "statement was chronological and coherent and to a large extent exculpatory in minimizing [the defendant's] role in the beatings"; that the defendant understood his rights and had the capacity to exercise those rights; and that the psychologist's "testimony regarding the [test's] inability to retroactively determine an individual's mental state [was] particularly credible." The record amply supports the judge's factual findings. See *Commonwealth* v. *Santo*, *supra*. The findings warrant the legal conclusion that the defendant was competent when he gave his statements to the police and that the statements were made voluntarily after a competent waiver of his Miranda warnings.

B. *Hearsay testimony.* The defendant objects to the admission of Melissa Terry's testimony regarding the out-of-court statements of Lena Perry, the defendant's mother. Terry testified that Lena Perry had said that the defendant was "in charge" of the victim. This statement was admitted de bene, on the theory that the Commonwealth would present evidence that Lena Perry was part of the joint venture. The judge denied the defendant's subsequent motion to exclude the evidence and instructed the jurors that, if they determined that the statement was made by a coventurer, they could consider this testimony.

The extrajudicial statement of a coventurer is admissible if the statement is made during the pendency of the joint venture and in furtherance of its goal. *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990). *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976). The defendant does not challenge this principle. Instead, he argues that the evidence was insufficient to show that Lena Perry was a coventurer. We disagree.

The evidence warranted the conclusion that Lena Perry participated in the kidnapping and beating of the victim. To be a coventurer, Lena Perry must have been "[1] present at the scene of the crime, [2] with knowledge that another intended to commit a crime, and [3] by agreement was willing and available to help the other if necessary." *Commonwealth* v. *Semedo*, 422 Mass. 716, 719 (1996).

Lena Perry was present throughout the months that the victim was kept in her home and specifically at the incidents during which the victim was restrained. The jurors also would have been warranted in concluding that Lena Perry knew of the victim's confinement. Such an inference was reasonable given her daily presence in her home where the victim was confined for months.

Lena Perry's participation went beyond mere presence at the scene of the crime. Frank Parker testified that Lena Perry "hit [the victim] with [a] cane." She aided in the kidnapping by providing the place of the victim's confinement. Her name was on the lease for the home, but neither the victim's nor the defendant's name was listed on the lease. She allowed the defendant to bring the victim into her home and then to confine the victim in her home, knowing that the victim was being abused in her home. This evidence was sufficient to permit the jurors to decide that Lena Perry was present and rendered assistance to the defendant and, therefore, that she was a coventurer.

The statement of a coventurer is admissible if the statement is made in furtherance of the joint venture. *Commonwealth* v. *Colon-Cruz*, *supra* at 543. Lena Perry's statement that the defendant was in charge and should decide what to do when the victim requested permission to use the bathroom was a statement made in furtherance of the kidnapping. The statement evinced Lena Perry's knowledge of the victim's confinement and facilitated the defendant's ongoing confinement of the victim.[15]

The evidence was sufficient for the judge to instruct the jurors

[15]Suzan Phillips testified that on one evening the defendant threatened Lena Perry in order to keep her from leaving the house. This evidence that Lena Perry was afraid of her son does not preclude the jurors from considering her statement if they determined she was a joint venturer. Phillips said that she accompanied Lena Perry to weekly church suppers, supporting the inference that Lena Perry was free to come and go. In the light most favorable to the Com-

that they could consider the statement if they determined that it was made as part of the joint venture. The hearsay testimony as to Lena Perry's statement was properly admitted as the statement of a coventurer made in furtherance of the joint venture. See *Commonwealth* v. *Colon-Cruz, supra.*[16]

C. *Exclusion of expert testimony.* One of the Commonwealth's key witnesses testified that, in the past, she struggled with a long-term addiction to drugs. The defendant sought to introduce expert testimony of the symptoms of prolonged drug abuse. In the defendant's proffer before the judge as to this testimony, defense counsel stated that the expert would testify to the effects of "prolonged and chronic marijuana use . . . [which is called] cannabis disorder," which caused symptoms such as

---

monwealth, there was sufficient evidence that Lena Perry was part of the joint venture. See *Commonwealth* v. *Salemme,* 395 Mass. 594, 595 (1985).

[16]The defendant argues that, if the admission of the statement were error, we should review under a harmless beyond a reasonable doubt standard. See *Commonwealth* v. *Miles,* 420 Mass. 67, 73 (1995). Generally in considering evidentiary rulings, we apply a nonprejudicial standard. See *Commonwealth* v. *Esteves,* 429 Mass. 636, 639 (1999). Although there was no error in the admission of the statement, we note that the statement was merely cumulative of the evidence that the defendant controlled the victim's life. For example, immediately after the defendant's mother said that the defendant was in charge of the victim, the defendant told the victim to go back upstairs. Parker testified that, when he was at the defendant's mother's home, it was the defendant who called the victim downstairs, beat the victim, and sent the victim upstairs. Laura White asked to see the victim in February and the defendant brought him downstairs. When White asked to look at the victim's arm, the defendant said no. The defendant told the victim he could not telephone his mother. The defendant also told the victim to tell White that the defendant had made him "give Johnny [Maynard] a blow job." The defendant laughed and said he made the victim do it. Thus, the statement that the defendant was in control of the victim was merely cumulative of other evidence making the same point.

Evidence regarding the victim's being forced to give Maynard a "blow job" was admitted in relation to a charge of aggravated rape. The judge granted the defendant's motion for a requested finding of not guilty on the charge of aggravated rape, but the testimony pertaining to this incident remained in evidence.

Although we do not consider evidence presented during the defendant's case in reaching our decision, we note that the Commonwealth's evidence on this issue did not deteriorate after the Commonwealth rested. See *Commonwealth* v. *Amazeen,* 375 Mass. 73, 80 n.5 (1978). A real estate agent who testified for the defense stated that Lena Perry forced her to wait forty-eight hours before showing the house, justifying the inference that Lena Perry was assisting in keeping the victim's confinement and condition a secret.

"the inability to remember, to recall, to perceive, and also . . . the ability to confabulate and create." The judge did not allow the expert's opinion in evidence. The defendant argues that the exclusion of this testimony was in error. We disagree.

The witness testified to having memory difficulties caused by other psychiatric conditions.[17] She also testified to her history of drug use. She was cross-examined fully on each of these topics.

"The admission of expert testimony lies in the sound discretion of the trial judge." *Commonwealth* v. *Jones*, 362 Mass. 497, 501 (1972). Evidence as to a witness's drug use may not be used to attack a witness's credibility unless the evidence relates to direct observation "*of the effect of drug consumption* on [the witness's] capacity to perceive or recall" (emphasis added). *Commonwealth* v. *Arce*, 426 Mass. 601, 604 (1998). Here, the expert witness never observed directly the condition his proposed testimony was to describe. Nor was there any evidence that the witness in fact suffered from such a condition.

In these circumstances, the proffered testimony would have served as expert commentary on the witness's credibility. "[A]n expert 'may not offer an opinion on a witness's credibility.' " *Commonwealth* v. *McIntyre*, 430 Mass. 529, 538 (1999), quoting *Commonwealth* v. *Ianello*, 401 Mass. 197, 202 (1987). See *United States* v. *Gonzales-Maldonado*, 115 F.3d 9, 16 (1st Cir. 1997). Credibility of witnesses is for the jury to decide. See *id.* Given the absence of evidence linking the witness's memory difficulties to her drug use, such expert testimony should not have been allowed. There was no error.

5. *The defendant's absence at jury voir dire.* Before the voir dire of the jurors, which took place at the sidebar, the judge asked defense counsel whether the defendant wished to be present at the sidebar. Defense counsel replied, "for this I would rather have him sit back there." The defendant argues that we should adopt a rule requiring judges to inquire of the defendant

___

[17]The witness testified that, due to psychiatric conditions, she had difficulties in sequencing events chronologically and had undergone counselling. The records reviewed by the defense expert support this testimony. Her psychiatric records listed these conditions as posttraumatic stress disorder and depression. The judge conducted proceedings in accord with our decision in *Commonwealth* v. *Bishop*, 416 Mass. 169 (1993), and ordered the witness's psychiatric records turned over to the defendant. The defense expert was permitted to testify that individuals with disorders like those of the witness might suffer from "major impairments in memory and integration of attention and perception."

whether he wishes to be present in these circumstances. The defendant also argues that, because he was not present at the sidebar, his right to be present at critical stages of the proceedings under the Sixth and Fourteenth Amendments to the United States Constitution, and under art. 12 of the Massachusetts Declaration of Rights, was violated. We disagree.

"A defendant is entitled to be present at all critical stages of a criminal proceeding, including voir dire of an individual juror, if 'an appropriate request for his presence is made.' *Commonwealth* v. *Owens*, 414 Mass. 595, 602 (1993). . . . The defendant made no such request in this case, the judge never 'excluded' him, and his counsel never objected to the defendant's absence. In such circumstances, we 'consider[] the issue waived and will not address it on appeal.' *Id.* at 605." *Commonwealth* v. *Johnson*, 426 Mass. 617, 626 n.5 (1998).

6. *Statutory right to use the telephone.* The defendant alleges an additional error which was not raised below. According to the defendant, the judge erred in admitting testimony of the defendant's confessions to the police because the defendant was denied his right to access to a telephone under G. L. c. 276, § 33E. Because this claim was not raised at trial, we review to determine whether there was an error and, if there were, whether that error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Ruddock*, 428 Mass. 288, 291-292 (1998).

The defendant was in custody on an unrelated matter when the police arrived at the house of correction to question him. General Laws c. 276, § 33A, provides: "The police official in charge of the . . . place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone . . . for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter." The statute is plainly inapplicable where the defendant already is incarcerated on another matter.[18] There was no error and, therefore, no substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Ruddock, supra.*

[18]In addition, we are not persuaded that the defendant was "in custody" with respect to the murder charge in this case. To determine whether an inmate is "in custody," courts, "rather than asking whether a prisoner was

7. *Conclusion.* We conclude that none of the defendant's claims on appeal warrants reversal. Having reviewed the record pursuant to G. L. c. 278, § 33E, we also conclude that there is no reason in law and justice for ordering entry of a lesser degree of guilt on the murder verdict or a new trial.

*Judgments affirmed.*

---

free to leave the facility . . . ask[] whether he is subject to some restraint in addition to those normally imposed on him by virtue of his status as an inmate." *Commonwealth* v. *Larkin*, 429 Mass. 426, 434 (1999), and cases cited. "An additional restraint is one that places a restriction on the inmate's freedom of action in connection with the interrogation and prevents him from leaving the scene of questioning by placing a further limit on his already restricted freedom of movement." *Id.* at 435, and cases cited.

Here, the defendant was not placed under arrest for the murder of the victim. The defendant was asked whether he wanted to speak to the police. He was brought to the correction officers' lunch break room and given coffee on request. Although he was escorted to the restroom, his freedom of movement was not limited beyond that to which he was already subject from incarceration for an unrelated offense.