COMMONWEALTH *vs.* VICTOR A. CARDARELLI, THIRD.

Plymouth. December 5, 2000. - March 9, 2001.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Evidence,* Photograph, Inflammatory evidence, Relevancy and materiality, Pattern of conduct, Motive, State of mind, Consciousness of guilt, Flight. *Homicide. Practice, Criminal,* Capital case.

At a murder trial, there was no error in the judge's admission of five autopsy photographs of the victim, where the photographs were relevant to the manner and cause of the victim's death and where the judge took appropriate measures to mitigate any prejudicial impact on the jury. [430-432]

At a murder trial, the judge properly allowed in evidence information on the defendant's gambling and financial expenditures in the weeks after the murder, to establish motive [432-435], and properly allowed testimony regarding the defendant's interstate travels in the months following the murder, as evidence of consciousness of guilt [435-437].

INDICTMENT found and returned in the Superior Court Department on February 3, 1997.

The case was tried before *Charles J. Hely,* J.

*James A. Couture* for the defendant.

*Carolyn A. Burbine,* Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. The defendant was convicted of murder in the first degree of his wife on theories of deliberate premeditation and extreme atrocity or cruelty. He claims that the Commonwealth's introduction of autopsy photographs of the victim and evidence of his posthomicide conduct denied him the right to a fair trial. He also asks that we reduce the degree of murder pursuant to G. L. c. 278, § 33E. We affirm the conviction, and decline the defendant's request to exercise our statutory power.

1. *Facts.* On November 11, 1996, the victim, usually a punctual employee, failed to appear at work. When a worried coworker telephoned the Plymouth apartment the victim shared with the defendant, the defendant informed her that the victim

had gone to California because members of her family had been in a serious automobile accident. That same day, the defendant told the victim's daughter-in-law, Linda Hendrick, that the victim was in a hospital recovering from dental work. When she was not able to locate the victim at any Plymouth-area hospital, Hendrick notified the Plymouth police.

After receiving another report from one of the victim's coworkers that the victim was missing, Plymouth police officers entered the apartment on November 17, 1996. They found it "immaculate," but the defendant and victim were not there. Detective John Rogers, Jr., of the Plymouth police department subsequently assembled a paper trail revealing that the defendant took numerous credit card advances, depleted funds from bank accounts held jointly with the victim, and gambled at various casinos in Connecticut and Atlantic City, New Jersey, between November 9, 1996, the day after the victim was last seen alive, and November 24, 1996. See Part 3, *infra.*

Hendrick remained in contact with the Plymouth police throughout December, 1996, and early January, 1997, but received no word of the victim's whereabouts. After she learned from the defendant's landlord that the defendant and victim were facing eviction for nonpayment of rent, she and her husband came to Massachusetts to clean out the Plymouth apartment. When they entered the apartment on January 10, 1997, they detected an odor of vinegar and discovered that various items of the victim's clothes and jewelry were missing. Noticing something amiss in the bedroom, they turned over the mattress, where they found bloodstains and bloody towels. They immediately notified the Plymouth police, who obtained a warrant and secured the apartment.

When they investigated the bedroom, State troopers found three blood-stained towels on the box spring, extensive bloodstains on the mattress and headboard, and "castoff" blood spatter patterns on the walls and ceiling. With the aid of a police "cadaver dog" the officers discovered a body wrapped in plastic and covered by assorted debris in an attic crawl space. A forensic odontologist used dental records to identify the partially decomposed corpse as that of the victim.

An autopsy revealed that the victim had died in early

November, 1996. It also revealed that she had suffered numerous fractures of her face and skull and severe damage to her brain, and had died from severe head trauma. Both the State medical examiner, who conducted the autopsy, and a forensic anthropologist who reviewed the autopsy photographs opined that the victim was struck at least twice with a considerable amount of force with a blunt object, and that semicircular skull fractures and other injuries to the victim's head could have been caused by blows from a cast iron frying pan found near the bed in the Plymouth apartment.[1] A Massachusetts State trooper who examined the blood spatter patterns testified that the victim was struck at least three times, and possibly more. He, too, testified that the pattern was consistent with the victim's being struck by the frying pan.

Atlantic City law enforcement officials and personnel at various casinos subsequently were notified that the defendant was missing, and known to gamble there. The defendant was detained by security personnel at a casino in Atlantic City on February 4, 1997, when he attempted to use a casino credit card.

After the defendant was returned to Massachusetts and given Miranda warnings, he told a State police detective that he must have killed the victim, remembered her bleeding from the face, but could not remember how or why he killed her. He admitted that he wrapped the victim's body in bedclothes and plastic and placed it in the attic. Asked whether there was anything in the apartment that he may have used to kill the victim, he replied that there were some pots and pans, but that he could not remember if he used them.

At trial the defendant did not dispute that he killed the victim. In his opening and closing statements, defense counsel suggested that the defendant's act constituted a heat of passion manslaughter, rather than premeditated murder. The judge instructed the jury on first degree murder and manslaughter, and informed them that they could consider whether the defendant, as a result of mental illness, lacked the capacity to form the

---

[1] A crime scene photograph depicted a cast iron frying pan in the oven, located a few feet away from the bed. Hendrick took the pan when she emptied the Plymouth apartment and later returned it to the district attorney's office.

intent or state of mind necessary for any particular offense. While defense counsel did not ask specifically for an insanity instruction,[2] and did not argue an insanity defense in his closing remarks, the judge also instructed the jury that they could find the defendant not guilty by reason of insanity if they determined that at the time of the offense, as a result of mental disease or defect, the defendant lacked the substantial capacity to understand the criminality or wrongfulness of his conduct or lacked the substantial capacity to conform his conduct to the requirements of the law.[3]

2. *Photographic evidence.* Over the defendant's objections, the Commonwealth was permitted to introduce five autopsy photographs during the testimony of the medical examiner.[4] One photograph displayed the victim's head before the examiner reflected, or cut back, the skin and hair. The other four portrayed her head after the skin was reflected. The defendant asserts that, because the Commonwealth introduced sufficient testimony to establish the nature and extent of the victim's injuries and the cause of her death apart from the photographs, the introduction

---

[2]Prior to trial, defense counsel informed the judge that he intended to ask for an insanity instruction at the close of evidence. At the defendant's request, the judge asked each juror during voir dire whether they held any opinions or prejudice that would prevent them from finding the defendant not guilty by reason of insanity if the evidence failed to convince them that he was sane.

[3]In his opening argument defense counsel hinted that there existed grounds to find the defendant not guilty by reason of insanity or to reduce the degree of murder owing to his lack of criminal responsibility. At the close of evidence, he asked the judge to instruct the jury that they could find the defendant guilty of manslaughter rather than murder based in part on evidence of a mental impairment, but noted that the evidence "does not rise perhaps to the level of a verdict of not guilty by reason of insanity." He abandoned the insanity defense completely in his closing remarks, arguing that "[the defendant is] taking responsibility, he's not trying to come up with some lame excuses. What you have in this case, and what is shown by the evidence is a hot blood manslaughter killing."

[4]Before the trial, the defendant filed a motion to suppress the photographs. The judge postponed ruling on the motion until trial. While the defendant now complains that the judge did not alert the jury venire that the evidence would include gruesome photographs, and thus did nothing to identify particularly squeamish jurors during empanelment, the judge understandably did not alert the jurors to photographs that were still the subject of a pending motion in limine.

of the images of the victim's partially decomposed head served no purpose other than to shock and sicken the jury. We disagree.

Our law on the admissibility of potentially prejudicial photographs is well established. As a general proposition, it is within the sound discretion of the trial judge to determine whether the inflammatory nature of a photograph outweighs its probative value. See *Commonwealth* v. *Vizcarrondo*, 431 Mass. 360, 362 (2000), quoting *Commonwealth* v. *DeSouza*, 428 Mass. 667, 670 (1999). While the defendant bears a heavy burden to demonstrate abuse of that discretion, *Commonwealth* v. *Berry*, 420 Mass. 95, 108 (1995), special caution is warranted where, as here, the photographs depict a decomposed body that has been further altered in the course of an autopsy. See *Commonwealth* v. *Bastarache*, 382 Mass. 86, 106 (1980). If the judge determines, after careful assessment, that photographs depicting an altered body are apt to be inflammatory or otherwise prejudicial, he should exercise his discretion to admit them only if they are important to the jury's resolution of any contested fact in the case. *Id.*

In this case, the defendant has not met his burden. The photographs were relevant to the issue of the manner and cause of the victim's death. Because the defendant claimed not to remember how or why he killed the victim, the Commonwealth resorted to circumstantial evidence to prove a manner of killing that would make out a case of extreme atrocity or cruelty. The depictions of the semicircular fractures of the victim's skull augmented the testimony of the medical examiner, forensic anthropologist, and police officer that the victim's injuries were consistent with being struck multiple times with the cast iron skillet found near the victim's bed. See *Commonwealth* v. *Richenburg*, 401 Mass. 663, 672 (1988). Even if photographs were cumulative of some of the testimony, the judge was not required to exclude them. See *Commonwealth* v. *Vizcarrondo, supra* at 362; *Commonwealth* v. *Maldonado*, 429 Mass. 502, 508 (1999). The images were probative of whether the defendant committed the murder with extreme atrocity or cruelty: a photograph that suggests the degree of force applied by an assailant and portrays the injuries inflicted is properly admissible for that purpose. See *Commonwealth* v. *Meinholz*, 420 Mass. 633, 635 (1995).

We reject the defendant's assertion that the portrayal of the victim's head in a state of decomposition and with its skin reflected rendered the photographs more prejudicial than probative. A photograph of a murder victim may be admissible despite its depiction of postmortem deterioration. See *Commonwealth* v. *Nadworny*, 396 Mass. 342, 366-367 (1985), cert. denied, 477 U.S. 904 (1986); *Commonwealth* v. *Allen*, 377 Mass. 674, 679 (1979). The photographs illustrate the nature and extent of the victim's injuries in a manner that the testimony of the medical examiner and forensic anthropologist, standing alone, could not. See *Commonwealth* v. *Gallagher*, 408 Mass. 510, 519 (1990) (affirming admission of autopsy photograph depicting skull cavity after medical examiner removed brain matter).[5] We have examined the photographs and conclude that they are not unnecessarily gruesome or shocking.[6] If photographs of a victim have evidentiary value, as these undeniably do, their gruesome nature does not render them inadmissible. *Commonwealth* v. *Maldonado, supra* at 508.

The judge also took appropriate measures to mitigate any prejudicial impact on the jury. Before publishing the photographs to the jury, he examined each picture and properly cautioned the jurors that the images might be distressing because of the decomposition of the victim's skin, and explained that the images were being published to "assist you in understanding [the medical examiner's] testimony with respect to the death and how the death was inflicted." He instructed the jurors not to give "any particular weight" to the details of decomposition. See *Commonwealth* v. *Vizcarrondo, supra* at 362; *Commonwealth* v. *Richenburg, supra* at 673. There was no abuse of discretion.

3. *Evidence of posthomicide conduct.* The judge denied the

[5] The defendant's reliance on *Commonwealth* v. *Richmond*, 371 Mass. 563 (1976), is misplaced. We reversed the conviction in that case because the admitted autopsy photographs depicted the results of postmortem mutilation by animals. The images presented to the jury in this case were probative because they illustrated the injuries resulting from the antemortem assault by the assailant. See *Commonwealth* v. *Meinholz*, 420 Mass. 633, 636 n.2 (1995).

[6] Before the start of the trial, the judge carefully examined the photographs and recommended that the Commonwealth crop them to remove any unnecessary portions that depicted decomposing flesh. As a result, the jurors viewed photographs representing only the victim's head.

defendant's pretrial motion to exclude evidence of the defendant's activities in the weeks after the murder. Over the defendant's objections, the judge permitted the Commonwealth to introduce in evidence information concerning the defendant's expenditures on gambling and other items, as well as his travels throughout the eastern and southern United States from the approximate time of the victim's death in early November, 1996, until his apprehension in New Jersey on February 4, 1997.[7] The defendant asserts that his right to a fair trial was violated because this evidence was not probative of any material issue, did not evince his consciousness of guilt, and was introduced solely to portray him as a "cad." There was no error.

The jury could have found that the defendant engaged in the following conduct after committing the murder. Between November 9, 1996, and approximately November 28, 1996, the defendant visited a Connecticut casino on several occasions, and spent about two weeks in Atlantic City, where he stayed and gambled in various hotels. During that period, he made two cash withdrawals totaling over $5,000 from a joint bank account he shared with the victim, leaving a zero balance. He almost depleted another joint checking account by purchasing $7,500 worth of traveler's checks, and took at least seven credit card advances at various casinos totaling nearly $11,000. The defendant also pawned for $35 a gold chain that may have belonged to the victim. He told an Atlantic City casino employee that his wife had died of cancer and that his coworkers had taken up a collection so that he could travel to Atlantic City.

The evidence also established that, in the eleven weeks following his sojourn in Atlantic City, the defendant traveled across the country. He drove to Key West, Florida, and visited his mother in Barefoot Bay, Florida. He told her that the victim was dying. When his mother informed him that the police were looking for him, he left her home within hours and then spent several weeks driving throughout the southern United States. In the course of travels that took him as far west as Galveston,

---

[7]The evidence consisted primarily of the testimony of New Jersey and Massachusetts police officers about statements the defendant made to them after he was apprehended in Atlantic City, as well as a "paper trail" chronicling the defendant's financial activities.

Texas, he lived in his automobile, ate at fast food restaurants, and bathed at rest stops or in swimming pools. At one point, he checked into a hotel under a false name. He admitted that he kept a Florida registration plate in the car, although it is not clear whether he actually used the plate. In February, 1997, he returned to Atlantic City; he told the police he intended to win enough money to pay bills and then turn himself in to authorities in Plymouth.

A trial judge may, in his discretion, admit evidence of acts committed subsequent to a charged offense. *Commonwealth* v. *Shraiar*, 397 Mass. 16, 26 (1986). Such evidence may not be introduced to prove the bad character or criminal propensity of the accused, *id.*, but may be admitted in the judge's discretion to establish a common scheme or plan, pattern of operation, intent, motive, or state of mind at the time of the crime. See *Commonwealth* v. *Rice*, 427 Mass. 203, 210 (1998); *Commonwealth* v. *Triplett*, 398 Mass. 561, 562-563 (1986), citing *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). The Commonwealth is entitled to "show the whole transaction of which the crime was a part," including uncharged conduct after the crime was committed, to prove a defendant's mental state at the time of a murder. *Commonwealth* v. *Longo*, 402 Mass. 482, 489 (1988), quoting *Commonwealth* v. *Durkin*, 257 Mass. 426, 428 (1926). To be sufficiently probative, however, the evidence of postcrime conduct "must be connected with the facts of the case or not be too remote in time." *Commonwealth* v. *Barrett*, 418 Mass. 788, 794 (1994), citing *Commonwealth* v. *King*, 387 Mass. 464, 469 (1982).

We agree with the Commonwealth that the evidence of the defendant's gambling, credit card use, and depletion of joint financial resources in the approximately two weeks after he killed the victim was properly admitted to establish motive. Viewing the defendant's activity in that period as part of a larger "transaction," a jury reasonably could infer that the defendant wanted to kill his wife so that he could spend their joint assets in the course of a gambling spree, without her interference. There was evidence that financial problems beset the defendant and the victim in the months before her death. In late 1996, to settle future support obligations to his children

from a previous marriage, the defendant relinquished his claim to his share of a house he owned with his former wife, frustrating the victim's hope that she and the defendant would be able to buy a house of their own. Less than three weeks later, the defendant lost his job. Coworkers and relatives of the victim testified that she seemed overwhelmed, anxious, and uncharacteristically sad after the defendant relinquished his interest in his former house and when she became aware that he had lost his job.

Although he was unemployed and his wife had suffered an apparent emotional downturn, the defendant took two credit card cash advances totaling $3,000 at a Connecticut casino on November 5 and 7, 1996, just days before the victim "disappeared." A jury could have inferred that evidence of the victim's frugal financial practices suggested that she would not have approved the defendant's liquidation of their joint assets or his use of a credit card to fund his gambling. The jury reasonably could have inferred that the defendant premeditated the murder of the victim after she discovered, and perhaps disapproved of, his spending and gambling. Just as plausibly, the jury could have inferred that the defendant commenced his gambling spree days before her death, having already planned to kill her.

Contrary to the defendant's assertion, evidence of the defendant's postcrime behavior was not rendered inadmissible merely because it was susceptible of another, less damning interpretation, namely, that he did not premeditate the murder, but gambled and spent freely only after he realized that he had killed his wife in a fit of "hot blood" and as a consequence believed that he had little to lose. If conflicting inferences are possible, as they are here, "it is for the jury to determine where the truth lies." *Commonwealth* v. *Pike*, 430 Mass. 317, 321 (1999).

Unlike the evidence of the defendant's financial activity, the testimony concerning his travels in Florida and other States from late November, 1996, through February 3, 1997, was not admissible to establish his state of mind, motive, or scheme. The specifics of his automobile odyssey were too remote in fact and time to be probative of his motive or state of mind at the time of the murder. See *Commonwealth* v. *Barrett, supra* at 421.

See also *Commonwealth* v. *Zagranski*, 408 Mass. 278, 281 (1990) (evidence of postkilling conduct must be "sufficiently related to the circumstances of the victim's death, in time and otherwise"). The record does not support an inference that the defendant plotted his wife's death so that he later could drive for months through Florida and other States while living in his automobile.

Nonetheless, that evidence was properly admitted because it is probative of his consciousness of guilt. A jury may consider evidence of a defendant's flight from prosecution as circumstantial evidence of his consciousness of guilt. See *Commonwealth* v. *Prater*, 431 Mass. 86, 97 (2000); *Commonwealth* v. *Stewart*, 398 Mass. 535, 547-549 (1986); *Commonwealth* v. *Toney*, 385 Mass. 575, 585 (1982). The jury reasonably could have interpreted the defendant's travels, his use of a false name, his lie to his mother about the victim's whereabouts, his living in his car, and his possession of a foreign registration plate as evidence of his ongoing efforts to avoid arrest.[8] While the defendant argues that his travels in plain sight in populated areas and his extensive use of credit cards and other easily traceable financial instruments indicate that he did not attempt to avoid arrest, it is for the jury to weigh the evidence and to determine the most credible explanation for a defendant's absence after committing a crime. See, e.g., *Commonwealth* v. *Toney*, *supra* at 584-585; *Commonwealth* v. *Booker*, 386 Mass. 466, 470-471 (1982).

On this record, evidence of the defendant's flight would not have been admissible as circumstantial evidence of his consciousness of guilt, and consequently as probative of his actual guilt, if the only question at trial was whether the defendant committed murder or manslaughter. *Commonwealth*

---

[8]The defendant told inconsistent stories concerning the victim's whereabouts to at least four people before he set out for Atlantic City after the murder. He also left a Connecticut hotel just forty-five minutes after checking in when the victim's brother threatened to call the police on the evening of November 14, 1996. He admitted to police that, while in Atlantic City, he was afraid to leave his hotel. The jury reasonably could have inferred from that statement that he feared being caught. The defendant concedes that it was permissible for the jury to consider these efforts to evade detection as evidence of consciousness of guilt.

v. *Blaikie*, 375 Mass. 601, 605-606 (1978).[9] It was proper for the jury to evaluate the evidence of flight as probative of the defendant's consciousness of guilt in this case, however, because there existed a question whether a criminal homicide was committed. See *Commonwealth* v. *Epsom*, 399 Mass. 254, 259 (1987) (evidence of flight is admissible as material consciousness of guilt evidence where defendant's self-defense claim challenges whether criminal homicide had been committed); *Commonwealth* v. *Lowe*, 391 Mass. 97, 108 n.6, cert. denied, 469 U.S. 840 (1984) (consciousness of guilt evidence is relevant to issue whether criminal homicide was committed). As noted previously, the judge instructed the jury that they could find the defendant not guilty by reason of insanity. The jury properly could have weighed the defendant's consciousness of guilt in determining whether he lacked the substantial capacity to understand the criminality or wrongfulness of his conduct or to conform his conduct to the requirements of the law. There was no error.

4. *General Laws c. 278, § 33E.* In seeking a reduction in the degree of murder under G. L. c. 278, § 33E, the defendant asks us to consider evidence that he did not deliberately premeditate

---

[9]The judge correctly instructed the jury as to the equivocal nature of evidence of flight and the various limitations on the use of consciousness of guilt evidence, in accordance with the requirements we established in *Commonwealth* v. *Toney*, 385 Mass. 575, 585 (1982). It would have been preferable for the judge to give an additional instruction that the jury could not consider the defendant's travels as circumstantial evidence of his consciousness of guilt on any issue other than lack of criminal responsibility. See *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605-606 (1978). The failure to give that instruction does not constitute reversible error in this case. The defendant's trial counsel neither requested such an instruction nor did he object to its absence. We therefore determine whether the absence of the instruction, if error, created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Avellar*, 416 Mass. 409, 421 (1993). The Commonwealth introduced abundant evidence, in addition to evidence that the defendant fled from arrest, to prove the defendant's mental state at the time of the murder. In light of the violent nature of the murder and introduction of evidence suggesting that the defendant had a financial motive for the killing, it is extremely unlikely that the jury convicted the defendant of murder in the first degree rather than manslaughter on the basis of evidence that, weeks after the murder, the defendant drove through numerous States over an eleven-week period to avoid detection by law enforcement. "If the required instructions had been given . . . '[w]e think it is reasonably clear that the verdict[ ] would not have been different.' " *Id.*, quoting *Commonwealth* v. *Cruz*, 416 Mass. 27, 32 (1993).

the murder. He asserts that he acted out of character in killing his wife, that his actions after his wife's death suggest "a man clearly out of touch with reality," that he was cooperative in providing details about the victim's death, and that he has no recollection of what he did to cause the victim's death or why he killed her. Citing *Commonwealth* v. *Cunneen*, 389 Mass. 216 (1983), he also contends that the Commonwealth introduced no evidence at trial suggesting that he took pleasure in his wife's suffering, employed means beyond those necessary to cause her death, administered an excessive number of blows, or fulfilled any other required factor justifying a conviction on a theory of extreme atrocity or cruelty. We have reviewed the entire record. The murder of the victim was brutal in nature, and there is ample evidence from which the jury could conclude that the defendant reflected before committing it. We find nothing that would compel us to exercise our discretion to reduce the verdict.

*Judgment affirmed.*