Commonwealth *v.* Kenney.

COMMONWEALTH *vs.* RICHARD KENNEY.

Middlesex. April 5, 2002. - June 13, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Practice, Criminal,* Motion to suppress, Admissions and confessions, Fees and costs, Jury and jurors, Assistance of counsel, Instructions to jury, Capital case. *Evidence,* Admissions and confessions, Identification, Photograph, Spontaneous utterance, Hearsay, Relevancy and materiality, Cross-examination, Bias, Motive, Credibility of witness, Alibi. *Constitutional Law,* Waiver of constitutional rights, Assistance of counsel. *Identification. Jury and Jurors. Witness,* Bias, Credibility.

There was no error in the admission in evidence of a criminal defendant's statement to police, where the record supported the judge's findings that the defendant's waiver of his Miranda rights was valid, and that his statement was voluntary. [146-147]

A motion to suppress the selection of a criminal defendant's photograph as that of "daddy" by a four year old boy and a three year old boy was properly denied, where the judge correctly determined that the photographs were not used as part of a pretrial identification procedure to identify the defendant as the person who shot the boys' mother, but that the photographs were shown to the boys to ascertain to whom they were referring. [147]

There was no abuse of discretion in a judge's denying a criminal defendant's motions for fees to hire an expert to assist him in calling children as witnesses where, besides failing to submit an affidavit with his motions, the defendant offered nothing to support his claim that an expert was necessary to prevent his being placed at a disadvantage when compared with one who could afford to pay for the preparation that the case reasonably required. [147-148]

At a criminal trial, the judge did not err in empanelling only fifteen jurors, where the defendant indicated satisfaction with each juror seated, and did not claim on appeal that any member of the jury was not impartial. [148]

At a criminal trial, the judge did not err in declining to order a medical examination of the defendant during trial, where the judge specifically addressed stand-by counsel's claim and determined that a continuance was unnecessary, and where nothing in the record suggested that the defendant actually failed to conduct his defense because of illness or fatigue. [148-149]

At a criminal trial, the judge did not abuse his discretion in failing to order stand-by counsel to resume representation where, having chosen to proceed pro se, the defendant waived his right to counsel, the judge opted to allow stand-by counsel to participate more actively as "hybrid counsel," and the defendant expressed satisfaction with the ruling. [149-150]

No substantial likelihood of a miscarriage of justice resulted from the admission of spontaneous utterances by the defendant's child and another child that identified "daddy" as the person who shot the children's mother, given the children's substantial youth, the severely traumatic event that they had witnessed, and their continued reaction throughout the day to the incident; further, the judge properly concluded that, because the statements were admissible as spontaneous utterances, there was no requirement that they also be admissible under the separate rule regarding extrajudicial identifications. [150-152]

At a criminal trial, the judge did not err in admitting testimony explaining that "daddy," as used in certain spontaneous utterances admitted at trial, referred to the defendant, where the defendant had testified that one of the children called him "daddy," and there was nothing to suggest that the children referred to another person as "daddy." [152]

No substantial likelihood of a miscarriage of justice resulted from the admission of autopsy photographs at a murder trial, where the photographs depicting the nature of the wounds sustained by the victim were relevant to the jury's determination whether the defendant had killed the victim with deliberate premeditation and with extreme atrocity or cruelty, where the photographs were not gruesome, and where the judge gave appropriate limiting instructions. [152-153]

At a criminal trial, the judge did not err in excluding testimony regarding the defendant's shoe size, where the judge properly found the evidence was irrelevant, and where, nevertheless, the defendant testified that his shoe size differed from sneakers found by the police, and his brother testified they were not the defendant's sneakers. [153]

At a murder trial, the judge did not err in allowing the prosecutor to ask certain allegedly inflammatory questions of the defendant during cross-examination, where there was an abundance of evidence to provide a basis for the prosecutor's questions. [153]

A criminal defendant failed to demonstrate that the trial judge improperly limited the defendant's cross-examination of the Commonwealth's rebuttal witness regarding her bias and motive to lie. [154]

At a criminal trial, there was no error in the judge's excluding testimony from several defense witnesses, where the defendant made no showing that the evidence would have helped the defense in any material way, and where some of the evidence would have proved detrimental to the defendant. [154]

At a criminal trial, the judge did not err in denying the defendant's request for an alibi instruction, where the defendant did not show that the judge failed to state clearly that the burden rested with the Commonwealth as to all aspects of the case, including proof that the defendant was the perpetrator. [154-155]

INDICTMENTS found and returned in the Superior Court Department on November 19, 1997.

Pretrial motions to suppress evidence were heard by *Thayer Fremont-Smith*, J., and the cases were tried before him.

*David Hayes Erickson* for the defendant.

*Afton M. Templin,* Assistant District Attorney (*Elizabeth F. Silverman,* Assistant District Attorney, with her) for the Commonwealth.

SPINA, J. The defendant, Richard Kenney, was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, and of unlawful possession of a firearm. On appeal, he claims that the trial judge, who also heard his motion to suppress, erred in (1) denying his motion to suppress statements he made while in police custody; (2) denying his motion to suppress unduly suggestive identifications; (3) denying his motion for fees for an expert witness to assist him in calling certain children as witnesses; (4) empanelling only fifteen jurors; (5) refusing to order a medical examination of the defendant during trial; (6) failing to order stand-by counsel to resume representation; (7) admitting spontaneous utterances by the defendant's child and another child that identified "daddy" as the shooter; (8) admitting testimony explaining that "daddy," as used in the spontaneous utterances, referred to the defendant; (9) admitting autopsy photographs; (10) excluding testimony regarding the defendant's shoe size; (11) allowing the prosecutor to ask inflammatory questions of the defendant during cross-examination; (12) excluding testimony from several defense witnesses; (13) excluding evidence of a witness's bias and motive to lie; and (14) denying the defendant's request for an alibi instruction. The defendant also asks us to grant him a new trial or reduce the verdict pursuant to G. L. c. 278, § 33E. We affirm the convictions and decline to order a new trial or otherwise grant § 33E relief.

1. *Facts.* The defendant shot his former girl friend, Annie Glenn, while she waited with her children at a school bus stop. Glenn had three children: four-year old Marquis Rivera, three-year old Darnell Kenney, and one year old Desiree Kenney. Darnell and Desiree were the defendant's biological children. Darnell called the defendant "daddy." The defendant had acted as Marquis's father, and Marquis referred to the defendant as "daddy."

Glenn lived at the House of Hope, a shelter for women and children located in Lowell. Shortly after 7 A.M. on Tuesday,

October 21, 1997, she left the shelter to bring her three children to a nearby bus stop, where Marquis took the bus to school. When they arrived, other children were waiting across the street for a different bus, some of whom witnessed the shooting and testified at trial. Moments after Annie arrived with her children, the defendant approached in Glenn's black Mercury Cougar and stopped near the bus stop.[1] He stepped out of the car, approached Glenn, and after speaking with her briefly, began arguing with her. The defendant said, "Give me my kid," referring to Desiree. Glenn refused, and put the baby down. The defendant pushed Glenn, then produced a gun. Glenn yelled, "No!" The defendant shot her in the chest. She screamed and fell to the sidewalk. Ignoring a plea from one of her sons to leave Glenn alone, the defendant shot her twice more in the head while she lay on the ground. He returned to the car and drove away, leaving Darnell and Marquis crying and holding their mother's hands.

Officer Steven Coyle of the Lowell police arrived at the bus stop and went over to Glenn. Finding no pulse, he called for assistance and attempted to revive her. He asked her sons whether Glenn was their mother. When he asked what happened, they stated that their daddy had a gun and that he just came and hit her. Glenn died minutes after the shooting.

Officer Michael Pelletier arrived as paramedics were trying to save Glenn. He attended to Marquis, who appeared withdrawn and in shock. Spontaneously, Marquis said, "daddy shot mommy." Pelletier, accompanied by another officer, walked the children back to the shelter. The boys were in a state of shock as a result of the incident. When they arrived at the shelter, Darnell told the program coordinator at the House of Hope that "dada shot mommy." He repeated the statement throughout the day.

At around 10:30 A.M., the children were brought to the Lowell police station, where Detective Gerald Wayne and State Trooper Steven Belanger separately interviewed Marquis and Darnell. Wayne asked each child what happened to their mother. Marquis told Wayne, "daddy shot mommy." Darnell, in turn, told Wayne, "daddy shot mommy in the hair." Both boys told

---

[1] Glenn owned a black Mercury Cougar automobile, but the defendant had possession of it.

him that Glenn referred to "daddy" as "Rich." Marquis also told Wayne that "daddy" jumped in the car and left after the shootings. Meanwhile, the Lowell police compiled a photographic array containing a photograph of the defendant. Wayne showed each of the boys, separately, an array with nine photographs and asked whether they saw a picture of the person they called "daddy." Each pointed at a photograph of the defendant.

After the shooting, the defendant drove to his mother's house in Derry, New Hampshire, arriving at around 8 A.M. on October 21. He asked his brother for a few dollars for gasoline, then left a few minutes later. The defendant next drove to East Cambridge, in search of his uncle, Ronald Kenney. He found Ronald at a supermarket. They returned to Ronald's house in Cambridge, where they spent the morning together.

Meanwhile, a Cambridge traffic department employee had found the Cougar illegally parked and ticketed it. Later, she learned that the police were searching for the car and reported its location to the Cambridge police, who set up surveillance around the car. At around 1:30 P.M., the defendant went to the car to look for change to buy cigarettes. Detective John Lopes of the Cambridge police waited for the defendant to enter the Cougar, then approached the vehicle, identified himself as a police officer, and ordered the defendant not to move. When asked, the defendant identified himself. Officers pat frisked the defendant. He told them, "I fucked up. The gun's in my uncle's house on Spring Street, 138. My uncle had nothing to do with it." He told the officers that the gun was in the house in his sneaker. Lopez read the defendant his Miranda rights from a card. The defendant complained of stomach pain, but he had no difficulty walking after the police allowed him to compose himself. His speech was coherent and he appeared to understand everything that was said. The defendant was eventually brought to the Lowell police station, where he confessed in detail to shooting Glenn.

After the defendant's arrest, Sergeants Patrick Nagle and Lester Sullivan of the Cambridge police went to Ronald Kenney's house. Kenney allowed them to enter and showed them where the defendant had been sitting. He identified a pair of

sneakers in the living room as belonging to the defendant. A pistol protruded from one of the sneakers. After securing the area, the officers obtained a search warrant for the gun and sneakers. Trooper Brian Gavioli, a ballistician, tested the gun and concluded that spent rounds and casings retrieved from the crime scene were fired from the defendant's gun. Police also obtained a search warrant for the Cougar. A search of the car revealed a letter from Glenn to the defendant stating that although she intended to allow him to continue seeing the children, she was breaking up with him because she could no longer trust him.

The defendant filed several motions to suppress identifications and to suppress statements, which were denied. On the first day of trial, the defendant filed a motion and supporting affidavit seeking dismissal of his two attorneys and leave to proceed pro se. After a colloquy, the defendant signed a waiver of counsel and he was allowed to proceed pro se. Counsel was asked, and agreed, to serve in a stand-by capacity.

At trial, the defendant claimed indifference to Glenn's decision to break up with him, testifying that he was involved with other women at the time. He denied shooting Glenn. He testified that he was at the Surf Building in Lowell with a drug dealer at the time of the shooting. The defendant also attempted to prove that he was under the influence of drugs at the time. He maintained that he merely signed the confession without reading it and that a combination of drug use and fatigue rendered his statements involuntary.

2. *Motion to suppress statements.* The defendant argues that the motion judge erred in finding that he knowingly, intelligently, and voluntarily waived his Miranda rights and voluntarily gave incriminating statements. He had offered evidence that when he was questioned at the Lowell police station, he had recently undergone cancer surgery, had been up all night drinking and smoking crack cocaine, had consumed marijuana, was sleep deprived, and had recently vomited in reaction to pain medication.

In reviewing a ruling on a motion to suppress statements, we accept the judge's subsidiary findings of fact absent clear error. We give substantial deference to his ultimate findings and

conclusions of law, but we independently review his application of constitutional principles. See *Commonwealth* v. *Perry*, 432 Mass. 214, 233-234 (2000), and cases cited.

Despite conflicting evidence, the judge found that the defendant was not under the influence of drugs and that his mental faculties were not impaired. The arresting officers and interviewing officers testified that the defendant did not exhibit signs of being under the influence of narcotics or alcohol. There was evidence that the defendant spoke clearly and intelligently during the interview, and he described his actions in detail. The defendant reviewed his statement to assure that the officers accurately recorded it. The judge's findings were not clearly erroneous. The record supports the judge's findings that the defendant's waiver of his Miranda rights was valid, and that his statement was voluntary.

3. *Motion to suppress identifications.* The defendant contends that the judge erred in denying his motion to suppress Marquis's and Darnell's selection of the defendant's photograph as that of "daddy." In moving to suppress the identifications, the defendant argued that the photographic array was unduly suggestive. The judge found that the photographs were shown to the children only to confirm that the defendant was the person that they had repeatedly referred to as "daddy." On appeal, the defendant claims that the judge should have suppressed the children's statements when shown the array, arguing that it was merely a "pretext" to identify the defendant because the photographic array did not include all "the possible Daddies."

As to Darnell, the argument is meritless because it was undisputed that the defendant was his father. Moreover, there was no evidence of pretext. The judge correctly determined that the photographs were not used as part of a pretrial identification procedure to identify the defendant as the shooter. The boys already had identified "daddy" as the shooter prior to their arrival at the police station. The photographs were shown to the children to ascertain to whom they were referring. See *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 6-7 (1986). There was no error.

4. *Request for expert fees.* The defendant argues that it was error to deny his motion for fees to hire an expert to assist him

in calling children as witnesses. The defendant requested the fees one week before trial, unsupported by affidavit. See G. L. c. 261, § 27C (setting forth standard for determining whether request for extra fees and costs should be granted). He orally renewed his request at trial, arguing that an expert was needed to help him decide whether to call the children.

Besides failing to submit an affidavit with his motions, the defendant offered nothing to support his claim that an expert was "reasonably necessary to prevent the party from being subjected to a disadvantage in preparing or presenting his case adequately, in comparison with one who could afford to pay for the preparation which the case reasonably requires." *Commonwealth* v. *Lockley*, 381 Mass. 156, 160-161 (1980). See G. L. c. 261, § 27C. The defendant has failed to show that the judge abused his discretion in denying the motions.

5. *Jury empanellment.* The defendant argues that the judge erred in excusing an empanelled juror for cause, leaving only fifteen trial jurors. Sixteen jurors were empanelled. Before the jury were sworn, the sixteenth juror revealed that she worked near the crime scene and remembered that the incident had upset her colleagues. The judge allowed the defendant's challenge for cause and proceeded with the remaining fifteen jurors. The defendant had exhausted the sixteen peremptory challenges allotted him. The defendant objected to proceeding with only fifteen jurors.

Although a judge may empanel up to sixteen jurors during a protracted case, see G. L. c. 234, § 26B, he is not required to do so. See *Commonwealth* v. *Beldotti*, 409 Mass. 553, 560-561 (1991). The judge followed proper procedures in empanelling the fifteen jurors. The defendant had exercised all of his peremptory challenges prior to the discharge of the sixteenth juror. The defendant's claim that he might have exercised his peremptory challenges differently is thus implausible. The defendant, moreover, indicated satisfaction with each juror seated, and he does not claim on appeal that any member of the jury was not impartial. See *Commonwealth* v. *Chaleumphong*, 434 Mass. 70, 74 (2001). There was no error.

6. *Request for a medical examination.* On the third day of trial, stand-by counsel requested the judge to inquire of the

defendant as to his physical state and moved for a continuance, contending that the defendant was "exhausted and worn-down," that he may not have slept for two days, that she had noticed a difference in his cognitive abilities, and that she had been unable adequately to consult with him regarding his defense. The defendant argues that in light of this proffer and his repeated assertions that he was ill, the judge was required to order a medical examination to determine if the illness interfered with his representation. We disagree.

The judge specifically addressed stand-by counsel's claim and determined that a continuance was unnecessary. The judge was in a position to observe the defendant, and the defendant points to nothing in the record that suggests that he actually failed to conduct his defense because of illness or fatigue. See *Commonwealth* v. *Chubbuck*, 384 Mass. 746, 752 (1981) (judge did not abuse discretion in denying defendant's midtrial motion for further psychiatric examination). There was no error.

7. *Defendant's request that stand-by counsel resume representation.* The defendant claims that the judge abused his discretion by not ordering stand-by counsel to resume representation, arguing that a number of factors, including the defendant's illness, discussed above, required the judge to order stand-by counsel to resume representation.[2] On the fourth day of trial, the defendant moved for a mistrial, citing his lack of legal expertise, his misunderstanding regarding the role of stand-by counsel, and what he perceived to be a negative reaction to his defense by the jury in the court room and the media in their reporting. The judge refused to declare a mistrial, but asked the defendant if he wanted stand-by counsel to resume representation as lead counsel, to which the defendant responded that he did. Stand-by counsel declined to accept that role. The judge stated that he had no authority to order counsel to resume representation. After further discussions, the judge granted the defendant's request that counsel be allowed to participate more actively as "hybrid" counsel, engaging in sidebar conferences,

---

[2]The defendant does not challenge the judge's initial decision to allow him to represent himself. See *Faretta* v. *California*, 422 U.S. 806, 835-836 (1975) (defendant has right to represent himself, even to his own detriment, if he knowingly and voluntarily elects to do so).

voicing objections, and assisting the defendant in preparing his cross-examination, a role that counsel was willing to accept.

Having chosen to proceed pro se, the defendant waived his right to counsel. See *Commonwealth* v. *Johnson*, 424 Mass. 338, 341-342 (1997); *Commonwealth* v. *Molino*, 411 Mass. 149, 153 (1991). The defendant did not have a right to stand-by counsel. See *Commonwealth* v. *Molino, supra.* Having realized that his decision to represent himself was imprudent, the defendant could request that stand-by counsel be reinstated to represent him. It is within the discretion of the judge to determine whether to require the defendant to proceed without counsel. The judge must weigh the constitutional protections of a defendant against the interest of orderly trial administration. See *Commonwealth* v. *Johnson, supra* at 342.

Where the defendant validly waived his right to counsel, the trial had proceeded for four days, and stand-by counsel indicated an unwillingness to resume representation, the judge was not required to order stand-by counsel to resume representation. A judge may consider the burdens on counsel. The judge opted to allow stand-by counsel to participate more actively as "hybrid counsel," a decision within the judge's broad discretion. See *Commonwealth* v. *Molino, supra* at 153 ("Hybrid representation is not prohibited; appointment of counsel in any hybrid situation is left to the discretion of the trial judge"). The defendant expressed satisfaction with the ruling. There was no error.

8. *Children's statements that "daddy" shot their mother.* The defendant argues that the judge erroneously admitted as spontaneous utterances Marquis's and Darnell's statements at the police station to the effect that "daddy" shot their mother. Because the defendant did not object, we review to determine whether any error resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992).

A statement is admissible as a spontaneous utterance if it was made under the influence of an exciting event, before the declarant had time to contrive or fabricate the statement, and that the statement tended to qualify, characterize and explain the underlying event. See *Commonwealth* v. *King*, 436 Mass. 252, 254 (2002). See also *Commonwealth* v. *Brown*, 413 Mass. 693,

695-696 (1992), quoting *Blake* v. *Springfield St. Ry.*, 6 Mass. App. Ct. 553, 556 (1978) (statement of three and one-half year old child made at hospital approximately five hours after severe beating was admissible). A judge has broad discretion to admit a statement as a spontaneous utterance. *Commonwealth* v. *Brown, supra* at 696. Strict contemporaneousness is not required, "so long as it appears that, notwithstanding the passage of some time, the statements were made under the stress of the exciting event" in a context ensuring their reliability. *Id.* See *Commonwealth* v. *Crawford*, 417 Mass. 358, 362 (1994), *S.C.*, 430 Mass. 683 (2000) (four year old child's statement that "daddy shot mummy" admissible hours after incident).

Here, the defendant argues only that because the judge had ruled that similar statements made earlier by the children at the House of Hope were not admissible as spontaneous utterances, the subsequent statements made in response to police questioning at the station were necessarily inadmissible. We disagree. The judge did not exclude the children's statements to officers at the shelter because they were not contemporaneous with the shooting, but because the particular questions asked by officers undermined any spontaneity in the children's answers, thereby rendering those statements inadmissible. The judge did not abuse his discretion in ruling that subsequent statements were nonetheless spontaneous utterances, given the children's substantial youth, the severely traumatic event that they had witnessed, and their continued reaction throughout the day to the incident. The fact that the children's statements were made in response to questions asking them who shot their mother did not necessarily render the statements inadmissible. See *Commonwealth* v. *Crawford, supra* at 363 n.3.

The defendant also argues that all out-of-court identifications by the children were inadmissible because the children did not testify. Specifically, he argues that the children's identifications of him as the shooter were inadmissible because they did not testify at trial and thereby acknowledge the prior extrajudicial identification. The case cited by the defendant is inapplicable, however, because the Commonwealth did not attempt to utilize testimony concerning an extrajudicial identification procedure to corroborate an in-court identification. See *Commonwealth* v. *Re-*

*poza*, 382 Mass. 119, 129-130 (1980), *S.C.*, 400 Mass. 516, cert. denied, 484 U.S. 935 (1987); *Commonwealth* v. *Sheeran*, 370 Mass. 82, 87 (1976). The judge properly held that, because the statements were admissible as spontaneous utterances, there was no requirement that they also be admissible under the separate rule regarding extrajudicial identifications. See *Commonwealth* v. *Mendrala*, 20 Mass. App. Ct. 398, 401 (1985). There was no error.

9. *Children's references to the defendant as "daddy."* The defendant claims that the judge erred in admitting testimony that the children referred to the defendant as "daddy." He contends that such testimony is inadmissible hearsay.[3]

Testimony that the children called the defendant "daddy" was not hearsay because it was not offered to prove the truth of the fact asserted, namely, that he was their father. See *Commonwealth* v. *Silanskas*, 433 Mass. 678, 693-694 (2001). Several witnesses testified from personal knowledge that Marquis and Darnell referred to the defendant as "daddy." The testimony was admissible for the limited purpose of explaining the children's use of that term. See *Commonwealth* v. *Gabbidon*, *supra* at 6-7 (defendant's nickname, if known to witness, is not hearsay). Similarly, the testimony by officers that the children said that the defendant (by photograph) was the person they called "daddy" was not hearsay.

The point is largely academic, however, because the defendant testified that Marquis called him "daddy." There is nothing to suggest that the children referred to another person as "daddy." There was no error.

10. *Autopsy photographs.* The defendant argues that the judge erred in admitting numerous inflammatory and prejudicial autopsy photographs, arguing that they had no evidentiary value. The defendant did not object to the two autopsy photographs admitted in evidence. Review is therefore limited to the question whether any error created a substantial likelihood of a miscarriage of justice.

A judge's decision to admit autopsy photographs is

---

[3]Aside from the testimony regarding the children's statements at the Lowell police station that the picture of the defendant was "daddy," the defendant did not object to other testimony concerning how the children addressed him.

discretionary. See *Commonwealth* v. *Cardarelli,* 433 Mass. 427, 431 (2001). The Commonwealth sought to prove through the photographs that Glenn's wounds demonstrate that the defendant killed her with deliberate premeditation and with extreme atrocity or cruelty. The photographs depicting the nature of the wounds was relevant to the jury's determination of these issues. *Id.* The photographs are not gruesome. The judge gave appropriate limiting instructions. There was no error.

11. *Evidence of the defendant's shoe size.* The defendant argues that the judge erred in refusing to allow him to remove his shoe to ask a chemist to testify as to the size of his shoe. The judge properly found that the evidence was irrelevant, because the defendant could have worn a larger or smaller shoe at trial, and the issue was largely collateral. Moreover, although the defendant argues that he offered the evidence in an attempt to prove that the sneakers containing the gun were not his, he designates nothing helpful to the defense, either by way of an offer of proof made below or otherwise, that would have been revealed had the shoe size been admitted. Nevertheless, the defendant got his point across, having testified that his shoe size differed from the sneakers found in his uncle's apartment. His brother testified that the sneakers were not the defendant's. There was no error.

12. *Cross-examination of the defendant.* The defendant argues that the judge erred in allowing the prosecutor to ask, over objection, "inflammatory" questions implying without any basis that the defendant had killed Glenn. Specifically, the prosecutor asked the defendant, "Were your kids crying when you walked away from shooting [the victim]?," and "Was Jowana Joyner present when you shot [the victim]?" The defendant denied killing Glenn in response to both questions.

Although "[i]t is error for a prosecutor 'to communicate impressions by innuendo through questions which are answered in the negative . . . when the questioner has no evidence to support the innuendo,' " *Commonwealth* v. *Fordham,* 417 Mass. 10, 20 (1994), quoting *Commonwealth* v. *White,* 367 Mass. 280, 284 (1975), there was an abundance of evidence to provide a basis for the prosecutor's questions. There was overwhelming evidence that the defendant shot Glenn. There was no error.

13. *Witness bias and motive to lie.* The defendant argues that the judge improperly limited his cross-examination of the Commonwealth's rebuttal witness regarding her bias and motive to lie. Specifically, the Commonwealth called Jowana Joyner, who testified to conversations with the defendant to rebut his claim of indifference toward Glenn's decision to break up with him. When the defendant asked Joyner on cross-examination, "Well, in fact, you and your mother arranged for this gun, correct?" the judge sustained the Commonwealth's objection to such testimony, ruling that it was beyond the scope of the rebuttal. The defendant argues on appeal that with regard to "the gun *used in the killing . . .* [the] sale or giving of the gun to [the defendant] was illegal and the possibility that the Commonwealth would prosecute her or her mother was motive for her to lie" (emphasis added).

Because evidence concerning motive to lie bears on credibility, it is admissible as a matter of right, provided there is some basis for the inquiry. *Commonwealth* v. *Martin,* 434 Mass. 1016, 1017 (2001). Although his argument is theoretically correct, it is self-defeating and is therefore without merit. The evidence that he claims to have sought from Joyner, that is, that she provided the gun that he used in the killing, would have been far more detrimental than beneficial to him. The ruling was harmless beyond a reasonable doubt.

14. *Excluded testimony.* The defendant claims that his right to present a defense was improperly restricted, pointing to several instances of excluded testimony which, he argues, would have contradicted the Commonwealth's case. We have reviewed these claims and are satisfied that the defendant has made no showing that the evidence would have helped the defense in any material way. We further conclude that some of the evidence would have proved detrimental to the defendant. There was no error.

15. *Alibi instruction.* The defendant argues that it was error for the judge to deny his request for an alibi instruction because he testified that he was elsewhere at the time of the shooting. Although it is preferable that a judge give an alibi instruction on suitable evidence, the omission is not error "if it is otherwise made clear that the burden of showing that the defendant was present at the time and place, and thus capable of committing

the crime, remains on the Commonwealth." *Commonwealth* v. *Medina*, 380 Mass. 565, 579 (1980). The defendant does not argue that the judge failed to state clearly that the burden rested with the Commonwealth as to all aspects of the case, including proof that the defendant was the perpetrator. There was no error.

16. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record, the transcripts, and the briefs and see no reason to reduce the murder conviction or order a new trial.

*Judgments affirmed.*