The defendant, Joshua Alvarez, is charged with carjacking in violation of G. L. c. 265, § 21A and armed robbery in violation of G. L. c. 265, § 17. He has moved to suppress a knife allegedly found on his person and statements made to law enforcement officers on October 9, 2023 [Papers Nos. 11 and 12].
FINDINGS OF FACT
            I held a hearing on April 2.8, 2026, and heard testimony from Trooper Kevin Duff who I found credible on all material matters. Having heard Duff's testimony and reviewed exhibits, including body-worn camera footage, I make the following findings of fact:
            On October 8, 2023, Trooper Kevin Duff was working  the 11 p.m. to 7 a.m. shift. At 11:14 p.m. he heard a BOLO ("be on the lookout") call over the radio following an armed carjacking in Cambridge. The perpetrators were described as two black males in black clothing who had committed an armed assault before stealing a motor vehicle. Duff later learned that a juvenile was arrested in relation to the carjacking. The juvenile identified the other person involved in the incident as "Josh A.-" She described him as a Black male wearing a black sweatshirt and white crocs, who was known to her as "Josh A." The witness said that Josh had
 
                                                            -1-
 
been dropped off at a McDonald's in Brighton. The McDonald's was between half to one mile away from where the carjacking had taken place.
            Duff and another trooper, Brian Taylor, drove over in their cruisers to the McDonald's on Western Avenue to look for the suspect. Two hours after the BOLO at around 1:12 a.m., he saw a Black male in black clothing and white crocs. The man was standing with two or three other people. Duff and Taylor were both in uniform and approached that person on foot. Both troopers were wearing body-worn cameras but did not have them turned on during the initial encounter. When asked about State Police policy regarding body-warn cameras, Duff said that it was supposed to be turned on when "viable." When directly asked at the hearing, he failed to explain why it was not viable for either trooper to have their cameras turned on. When the troopers were ten to fifteen yards away from Alvarez, one of them called out "Josh" and the Black man in black clothes turned towards them. The man was immediately handcuffed. He was placed under arrest and searched.[1] One of the troopers found a folding knife on him. He was identified as "Joshua Alvarez."[2] He was placed in the back of a cruiser.
            While Alvarez was seated in the back of the cruiser with his hands cuffed behind his back, Duff quickly read Miranda advisements from a card. This interaction was recorded on both troopers' body-worn cameras. They were standing by the open car door, and Duff had a flashlight
 
--------------------------------------------
 
[1] Duff's testimony was that the suspect was immediately handcuffed when the troopers approached. There was no testimony regarding concerns about officer safety and no suggestion that the handcuffs were placed on the suspect for safety reasons. When asked, he stated that Alvarez was not free to leave. He then described a search of Alvarez's person and did not characterize it as a patfrisk for weapons. Taking the testimony as a whole, I find that Alvarez was immediately handcuffed, placed under arrest and searched.
[2] The evidence presented leaves open the question of whether Alvarez's name was revealed before or after he was arrested. Duff testified about handcuffing Alvarez and that he "later learned" that the suspect's name was Joshua Alvarez. This gap in the evidence is important to the legal analysis and will be discussed in the Rulings of Law section. Had the troopers turned on their body-worn camera, this could have been clarified. By the time that Alvarez was questioned in the back of the cruiser, and the cameras were turned on, the troopers knew his name and referred to him as "Josh" when they spoke to him.
 
                                                            2-2
 
pointed in Alvarez's direction. Alvarez indicated that he understood his rights and agreed to speak to the officers. He was slouched with his head down. He was asked what he had been doing earlier that night around 11 p.m. Alvarez responded that he was at his cousin Destiny's house in Cambridge. His sister was with them. He told police that he had caught up with the people who were with him in the McDonald's parking lot approximately one hour before the police arrived. He denied being with anyone else that night. Duff asked him if he knew someone named "Valentina." He answered negatively. He was told "she knows you." Alvarez said that he went to school with her. Taylor encouraged him to be honest with them and directly asked if he had stolen a motor vehicle. Alvarez shut his eyes and did not respond. Taylor asked him his age and Alvarez told them that he was eighteen. The officers explained that it is better to be honest and that "it goes a long way." Taylor asked if he had been in a stolen motor vehicle earlier and Alvarez answered affirmatively. He was asked for the name of the other person involved in the theft. Alvarez said that he did not want to say the name but "your partner already said the name." The trooper thanked him for being honest. Taylor asked how he had accessed the car and Alvarez said that it had been unlocked.
            Alvarez was taken to the State Police barracks in Boston by Duff and booked. His crocs were visible on Duff's the video footage and they were white with some black or gray swirls. He was seated on a bench in the booking area handcuffed to the bench. A trooper read him Miranda warnings from a paper. The officer gave him the paper that he had read from, and Alvarez signed it with his free hand. Approximately six minutes later, a trooper, who was across the room from where Alvarez was seated, asked if "the guy" was in the car when they took it. Alvarez said that he was out of the car. Alvarez asked how long he would be in the station. Duff responded that "it depends" but noted that Alvarez did not have a record. Duff proceeded to get information to fill
 
                                                            -3-
 
out the booking form. Alvarez asked about whether he would be taken to court and Duff explained that the "bail clerk" could set bail. When asked about medication, Alvarez said he took medication for ADHD.
            Alvarez asked, "When is the fastest I can get the lawyer?" One of the troopers in the room answered, "The fastest you can a lawyer is when you go to court. We have nothing to do with this process. Absolutely nothing." The trooper proceeded to say that when Alvarez went to court, which would be on Tuesday because it was a holiday weekend, he could get a lawyer appointed who would be paid for by the state. Alvarez appeared exhausted and defeated and sat slouched with his head down. He repeatedly rubbed his face with the palm of his hand.
            A few minutes later, a trooper asked "how did it go down? Because we have cameras in the area and we just got in contact with the guy whose car was stolen. So do you want to say how you actually did it?" Alvarez asked, "Can I talk to someone first?" A trooper responded that "you don't have to say anything but the court is when the lawyer helps out." Alvarez stayed silent for a few minutes and then made statements to the trooper.[3]
            The Commonwealth concedes that Alvarez invoked his right to counsel, which was not honored, when he asked, "Can I talk to someone first?"
RULINGS  OF LAW
            I. Search of the Defendant
            "To justify an investigatory stop under both the Fourth Amendment to the United States Constitution and article 14 of the Massachusetts Declaration of Rights, the police must possess 'reasonable suspicion' the person has committed, is committing, or is about to commit a crime." Commonwealth v. Costa, 448 Mass. 510,514 (2007), citing Commonwealth v. Lyons, 409 Mass.
 
--------------------------------------------
 
[3] I could not hear what Alvarez said when reviewing the recording the recoding.
 
                                                            -4-
 
16, 18-19 (1990). "A person is seized under art. 14 of the Massachusetts Declaration of Rights only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Commonwealth v. Meneus, 476 Mass. 231, 234-235 (2017) (internal quotation marks omitted). Reasonable suspicion must be based on specific, articulable facts, along with the reasonable inferences drawn therefrom, and not on a mere hunch. Id at 235.
            Probable cause exists where "the facts and circumstances within the knowledge of the police are enough to warrant a prudent person in believing that the individual. .. has committed or was committing an offense." Washington, 449 Mass. at 481. Probable cause is an objective standard that is more than reasonable suspicion but does not rise to the degree of certainty necessary for a criminal conviction. Commonwealth v. Ilya I., 470 Mass. 625, 628 (2015).
            When a person is seized, the degree of intrusion must be proportional to the level of suspicion. Commonwealth v. Borges, 395 Mass. 788, 794 (1985). In this case, two uniformed troopers approached Alvarez and his companions at a McDonald's where the juvenile involved in the carjacking had said that "Josh A" had been dropped off in the two hours that had passed since the alleged carjacking took place. The troopers arrived in their marked cruisers and had not turned on lights or sirens. Alvarez was wearing a black hoodie and white crocs, which was consistent with the description given by the juvenile. No information was provided about the other individuals in the group or about other people in the parking lot, including whether there were other people in the parking lot. One of the troopers called out "Josh" when they were ten to fifteen yards away. Alvarez turned in response to the name being called. There was no testimony to suggest that Alvarez was aware of the troopers approaching until he turned around. He was quickly placed in handcuffs, arrested, and
 
                                                            -5-
 
searched incident to arrest. A folding knife was located. This individual was identified as "Joshua Alvarez" at some point. Because the troopers immediately arrested Alvarez, the question becomes whether, given these facts, they had probable cause to arrest.
            The timing of when the troopers learned Alvarez's name is central to the probable cause determination. The evidence presented leaves open the question of whether Alvarez's name was revealed before or after he was arrested. The police had received information from the juvenile that she had committed the offense with "Josh A." While Alvarez turned his head when one of the approaching troopers called out the name "Josh," this does not necessarily support the conclusion that the suspect was named Josh. Had Alvarez not been named Josh, he still may have turned around to see who was calling the name. There was no testimony regarding whether other people in his group turned around when the police called out the name. The remaining query is when the police determined that the suspect was named "Joshua Alvarez." In the absence of clear evidence, it is just as reasonable to infer that the police learned Alvarez's full name after the search as it is to infer that they learned his name before the search. The calculus in determining the appropriateness of the search hinges on determining when the police determined that the suspect was likely "Josh A."
            In the absence of body-worn camera footage, and no satisfactory explanation as to why neither trooper had their cameras activated, the evidence tips in Defendant's favor. In Commonwealth v. DiGiambattista, where an interrogation was not recorded, the Supreme Judicial Court stated that the failure to record could comprise a basis for finding that the interrogation was involuntary. 442 Mass. 423,441 (2004). Here, I apply the same reasoning and find that the Commonwealth has not shown that the police knew Alvarez's full name before arresting and searching him.
 
                                                            -6-
 
            Having resolved this question of fact in Defendant's favor, the evidence shows that the police learned that a Black male named "Josh A" had been involved in the carjacking and that he was wearing black clothing and white crocs. They were told that Josh A. had been left at the McDonald's in Brighton at some time after the carjacking. The troopers went to the McDonald's two hours after the reported carjacking, which was less than a mile from the si:te where the crime had occurred. They saw a Black male wearing dark clothes and white crocs4 standing in a group of three or four people. As the troopers approached' one of them called the name "Josh" and the suspect turned in their direction. At that point he would have seen two uniformed troopers and he did not step back or try to flee. He was handcuffed, arrested and searched incident to arrest. After his arrest, the police learned that the suspect's name was Joshua Alvarez.
            An arrest requires probable cause. The police had at most reasonable suspicion to conduct an investigatory stop of Alvarez but declined to do so. They arrested him upon approach and searched him incident to arrest. The description of"JoshA." was mostly general: Josh A. was a Black male in black clothes and the only distinguishing feature was the suspect's shoes.
The fact that Alvarez was at a location where a witness said that Josh A. had gone within the past two hours adds to the degree of suspicion but does not amount to probable cause. Cf. Commonwealth v. Scott, 440 Mass. 642, 648 (2004) ("general description of a tall, muscular, black male" and his location insufficient to establish reasonable suspicion for investigative stop). Because Alvarez was arrested without probable cause, any items recovered pursuant to a search incident to arrest must be suppressed.
 
--------------------------------------------
 
[4] The fact that the white crocs had black and gray swirls on them does not change that the shoes fit the description provided.
 
                                                            -7-
 
            II. Defendant's Statements
            Because Alvarez was arrested without probable cause and he made statements while under arrest, those statements must be suppressed as fruits of the poisonous tree. Brown v. Illinois, 422 U.S. 590,605 (1975). Had his arrest been lawful, I would have found that Alvarez waived his Miranda rights and voluntarily spoken to police officers, despite his age and inexperience with the criminal legal system. He waived these rights while seated in the cruiser and in the booking area of the station. However, his invocation of his right to counsel was not honored while at the station.
            The parties dispute whether Alvarez invoked his right to counsel when he asked, "When is the fastest I can get the lawyer?" The clarity of the invocation of the right to counsel must be evident. Commonwealth v. Obershaw, 435 Mass. 794, 798-99 (2002). The difference between an unambiguous and ambiguous invocations can be slight. See, e.g., Commonwealth v. Contos, 435 Mass. 19, 29-30 (2001) ("I think I'm going to get a lawyer" constituted unambiguous invocation). Compare to Commonwealth v. Pennellatore, 392 Mass. 382,387 (1984) ("I guess I'll have to have a lawyer for this" is not an affirmative request). Invocation of the right to counsel requires, at a minimum, some statement that can be reasonably construed to be an expression of a desire for the assistance of an attorney. Commonwealth v. Judge, 420 Mass 433 Mass. 433,450 (1995).
            I find that Alvarez made a statement that expressed his desire for the assistance of counsel when he asked, "When is the fastest I can get the lawyer?" He was confused as to how soon he would be provided a lawyer, which leads to the logical conclusion that he could not afford to hire his own attorney. The trooper responded, "The fastest you can a lawyer is when you go to court. We have nothing to do with this process. Absolutely nothing." While the trooper
 
                                                            -8-
 
is correct that indigent defendants in the Commonwealth are not provided lawyers prior to arraignment unless they are arrested for murder, he effectively dismissed Alvarez's request for a lawyer. Several minutes later a trooper asked Alvarez for details regarding the carjacking when he asked, "How did it go down?" Alvarez's response to that question and any subsequent statements are not admissible.
ORDER
            Defendant's motions to suppress evidence and statements are ALLOWED.
/s/Keren Goldenberg
Justice of the Superior Court
DATE:
May 18, 2026